**RIGBY CORPORATION and Ingram Enterprises, Inc., Appellants,**

v.

**BOATMEN'S BANK AND TRUST CO. and Boatmen's Bancshares, Inc., Respondents.**

**No. WD 36048.**

Missouri Court of Appeals, Western District.

June 24, 1986.

518

Thomas J. Conway, Popham, Conway, Sweeney, Fremont & Bundschu, Kansas City, for appellants.

Allan L. Bioff, Paul R. Lamoree, Watson, Ess, Marshall & Enggas, Kansas City, for respondents.

Before PRITCHARD, P.J., and SHANGLER and DIXON, JJ.

SHANGLER, Judge.

This suit arose out of a commercial loan transaction between Rigby Corporation and Boatmen's Bank and Trust Company of Kansas City and, incidentally, Boatmen's Bancshares, Inc. Rigby brought a petition in eight counts which asserted tort claims against Bank and Bancshares for nonextension of the Rigby promissory note and for the exercise of collection remedies. Bank and Bancshares counterclaimed that the loan was fraudulently and otherwise unlawfully induced, and sought damages and equitable relief. The trial court thereafter, on the basis of voluminous deposition testimony, affidavits and formal exhibits, determined that there was no genuine issue of any material fact and granted summary judgment under Rule 74.04 on the motion of the defendants. The judgment was designated an appealable order. The counterclaims as well as a crossclaim remain unadjudicated.[1]

1. The opinion-head nominates the parties as they appear on the notice of appeal. The amended petition, on which the issues were submitted for summary judgment, designates the plaintiff Rigby plurally and involves parties the notice of appeal neglects. The parties in interest, in any event, are neither as designated by the notice of appeal or by the rubric of the amended petition. To facilitate the posture of the principals as well as the narrative of the facts, the designations and roles of the parties are best defined at outset.

Rigby Corporation was a debtor in bankruptcy at the time the petition was brought. The suit was enabled at all by the special order of the bankruptcy court that Rigby Corporation, as

On review of a summary judgment, the party against whom the order was entered is accorded every favorable intendment of the record. *Thompson v. Parker*, 608 S.W.2d 415, 416[1] (Mo. banc 1980). We recite the evidence relevant to opinion conformably to that rule of review.

Rigby was a printer and lithographer of quality with a national market. It was wholly owned by Ingram Enterprises, Inc. which, in turn, was wholly owned by Robert P. Ingram. Ingram, the person, was the president and active manager of Rigby. The company had banked with the First National Bank of St. Louis, but in late 1975 Ingram became dissatisfied with those services and transferred the Rigby business to the [then] Baltimore Bank & Trust Company of Kansas City, now Boatmen's Bank of Kansas City. Ingram became a member of the board of directors of the Boatmen's Bank and served on the discount committee of the Bank. In February of 1976, Ingram sought a $1,500,000 line of credit for Rigby. The loan was confirmed by letter from Regnier, vice-president of Boatmen's Bank on condition of the personal guaranty of Robert P. Ingram.[2] Another condition of the credit line, moreover, was the Rigby agreement that all receivables [pledged to secure the loan] be deposited in a lock box for collection by Boatmen's Bank and then for ascription that same day to the Rigby account. The loan was pledged by successive 30-day promissory notes and a security agreement which assigned the Rigby inventory and accounts receivable.[3] The security agreement was executed on February 23, 1976 by Regnier for the Bank and by Ingram for Rigby, and was additionally assured by the guaranty of the person Ingram. Rigby then executed a 30–day promissory note for $500,000 on February 27, 1976.

In accordance with the conditions of the line of credit, Rigby furnished financial reports. They showed minor losses during the first four months of 1976. The labor agreement between Rigby and the Graphic Arts International Union expired at the end of April, 1976, negotiations for a new agreement failed, and the union employees went on strike. Rigby hired replacement personnel, but they lacked skill so that the work as well as the quality suffered. Customers complained, accounts were can-

debtor-in-possession, employ counsel to assert the commercial tort the debtor claimed against Boatmen's Bank and Bancshares. Notwithstanding that explicit direction, the petition names as suitors-plaintiffs: Rigby Corporation, Debtor, Rigby Corporation, Debtor-in-Possession and Ingram Enterprises, Inc. The defendants Bank and Bancshares move the dismissal of Rigby Corporation, Debtor and Ingram Enterprises, Inc., as without status to sue for the chose in action reserved by the bankruptcy court order to Rigby Corporation, Debtor-in-Possession. The motion remains unruled. In terms of legal interest, therefore, the valid designation of the parties is neither as named in the body of the amended petition nor on the notice of appeal.

It is evident, even from the allegations of the pleadings, that any claim of Ingram Enterprises, Inc. derives from the Rigby Corporation, and the Rigby Corporation as debtor in possession—alone was authorized by the bankruptcy court to bring this action. It is evident from the proofs, as well, that Ingram Enterprises, Inc. asserts no separate interest, and therefore lacks status to sue as a plaintiff in this action. Accordingly, we enter the order the trial court should have entered on the motion and dismiss Ingram Enterprises, Inc. as a party plaintiff.

These original parties were later augmented by the third-party petition of defendants Bank and Bancshares which joined Robert P. Ingram as third-party defendant. Ingram was a prime mover of the events throughout. He was the sole shareowner of Ingram Enterprises, Inc., which in turn wholly owned Rigby Corporation. Ingram was also president and chief manager of Rigby. The pleadings of defendants Bank and Bancshares not only counterclaimed against the two Rigby embodiments and Ingram Enterprises, Inc.—the three nominated as plaintiffs—but also cross-claimed against Ingram, the person, for fraud and illegality in the inducement of the loan.

2. Actually, the $1,500,000 line of credit to Rigby was by the joint and equal participation of the Boatmen's Bank & Trust Company of Kansas City and the Boatmen's Bank & Trust Company of St. Louis.

3. The credit line of $1,500,000 was secured by a blanket assignment of accounts receivable and inventory under a formula of 85% of accounts receivables and 75% of inventory—which means that the loan commitment was for the equivalent of 85% of the Rigby eligible receivables and 75% of the factory inventory, up to $1,500,000.

celled, and the losses mounted. The strike continued so that the operating losses by the end of September, 1976 accumulated to $1,132,859. Thus, instead of the $550,000 Rigby profit projected for 1976 by President Ingram and Vice President-Finance Menze to Regnier and Brennan of the two Boatmen's Banks, by the end of September the losses already exceeded $1,000,000. The successive 30–day notes continued the debt over from the previous month, as well as any accrual. The 30–day note executed by Rigby in September of 1976 continued over an accrued debt of $1,450,000 and was due on October 25, 1976. The terms of the note empowered Boatmen's certain rights against the collateral, granted the lender Bank the right of offset against the matured debt of all funds held by the Bank— *without notice.*[4]

The unabated labor strife and the continued loss of earnings became a matter of concern at Boatmen's.[5] On September 8, 1976, Regnier, bank vice-president, talked with Menze, Rigby vice president-finance, who informed him that August would show a substantial loss. At that time the margin between the loan and the value of the collateral [computed on the value of 85% eligible receivables and 75% of the factory inventory formula] was down to $242,000. Later that month, Regnier requested Ingram to pledge an additional $200,000 in securities as collateral for the loan. Ingram did not respond. McCarter, Boatmen's president, made a like request—specifically that Ingram pledge Rubbermaid stock in that value: [The Ingram financial statement on file with the Bank represented he owned Rubbermaid shares with a

market value in excess of $5,000,000.] Ingram did not comply. Ingram instead, as suggested by McCarter, met with Brennan, senior vice president of Bancshares and chairman of the executive committee of Boatmen's [St. Louis].

On *October 12, 1976,* Ingram met with Brennan in St. Louis. They discussed the Rigby state of affairs and the bank request for more collateral. Ingram expressed optimism about Rigby because a new president, Parker, had recently assumed management. Ingram made known to Brennan that Rigby needed an immediate infusion of $500,000 for that October. Brennan, instead, requested that Ingram provide full collateral for the promissory note debt of $1,450,000 then outstanding. Ingram tendered some Rigby acreage at the plant site, some coin lockers and two radio stations. Brennan considered the radio stations to lack liquidity as security because of the Federal Communications Commission license requirements; the coin locker service also lacked liquidity, and the mortgage on the Rigby acreage would be subject to avoidance as a preference in case of bankruptcy. Brennan expressed interest only in marketable securities as additional collateral—preferably securities traded on the New York Stock Exchange. In the course of conversation, the sale of Rigby was mentioned, and the meeting ended with the expression by Ingram that he would explore that possibility. Ingram commented, however, that thirty or sixty days would be required to find a purchaser at an acceptable sales price. At the time of that meeting with Brennan—on October 12, 1976—Ingram already knew [through Rig-

---

4. "The right is expressly granted to Bank, exercisable at its option at any time, to receive the income on any and all of the collateral pledged hereunder and to hold the same as security for any obligation of any of the undersigned or apply it on the principal or interest due or becoming due hereon or due on any liability secured hereby. Furthermore, *Bank reserves the right to offset all funds held by Bank against matured debts owning [sic] to Bank by undersigned without notice.*

"Each of the undersigned expressly waives presentment, protest, demand, notice of dishonor or default with reference to this note or the

performance of any obligation under this note." [emphasis added]

5. Rigby reported successive monthly losses from the inception of the strike until the loan was called in October of 1976:

| May | $131,098 |
| June | $167,325 |
| July | $287,954 |
| August | $290,280 |
| September | $246,280 |

Rigby also reported expected losses in October.

by financial officer Menze] that the company projected losses for October, for November, and for December, so that $500,000 was needed immediately in order to continue operations, but Ingram did not disclose that information to Brennan.

On *October 14, 1976,* upon return to Kansas City, Ingram delivered to McCarter, president of Boatmen's [Kansas City] a $500,000 mortgage executed by *Rigby* in favor of the Bank on the owned acreage. Ingram then told McCarter that the mortgage was additional collateral for the outstanding indebtedness along with stocks he intended to obtain and deliver. McCarter told Ingram—if not on that precise occasion, then a few days later—that the mortgage was not satisfactory as collateral for two reasons: Boatmen's did not know the actual value of the land and the mortgage would constitute a preference in the event of the Rigby bankruptcy.

On *October 17, 1976,* at the request of Ingram, a group of interested bankers attended at his home: Ilus W. Davis, chairman of the board of Boatmen's [Kansas City], McCarter, president of Boatmen's [Kansas City] and Maurice D.S. Johnson, president of the Citizen's Fidelity Bank & Trust Co. of Louisville, Kentucky—the latter a quondam member of the Rigby and of the Ingram Enterprises boards of directors, business associate and confidant of Ingram. Ingram knew at outset that in view of the continued financial Rigby losses, there was serious doubt Boatmen's would renew the note due on October 25, 1976. They spoke of the Rigby financial straits. Ingram and Johnson described it in terms of "a serious situation." Ingram advised them that Rigby was in arrears to its suppliers and needed, immediately, $500,000 in new money and an additional $400,000 to $500,000 next month—in November, otherwise there was possibility the suppliers would force Rigby into bankruptcy. [That was one of the very reasons Ingram convened the bankers at his home]. There was no response to the overture for new money, and nothing Davis or McCarter said induced Ingram to such a belief. Davis and McCarter, rather, requested additional collateral for the $1,450,000 indebtedness already outstanding. Ingram once again tendered the radio stations, coin lockers, and mortgage on the eleven Rigby acres to satisfy that demand for additional collateral. McCarter informed Ingram—as had Brennan earlier—that the license requirements rendered the radio stations undesirable as collateral and that the coin lockers were no more liquid. McCarter reiterated to Ingram that any mortgage on Rigby property would be considered a preference in the event of bankruptcy, and, in any event, the Bank simply did not know how to value the property. Ingram understood that the assets acceptable to Boatmen's as the additional collateral on his personal guaranty of the Rigby loan were marketable securities—stocks and bonds listed on the New York Stock Exchange—and particularly the owned Rubbermaid shares. Ingram agreed to "bring in all available stock," and three days later on October 20, 1976, he delivered owned shares of Rubbermaid and Bancshares, Inc. with a market value of $140,000.

The possibility of a Rigby bankruptcy was also a subject for discussion. Ingram and Johnson urged time for an orderly liquidation—and that some thirty to ninety days were required to consummate a sale. Ingram and Johnson expressed belief that a forced sale would risk two valuable assets: a $3,000,000 tax loss carry-forward which would dissipate unless the company was sold as a going business, and the Rigby option to purchase the 26 acres of ground on which the factory stood for $1 on January 1, 1984, under an option of the lease. Johnson [as related by Ingram] was "well acquainted with a number of large corporations that were prospective buyers for Rigby." This discussion, Ingram said, was prompted by concern that the Bank would not renew the existent note. It was the Ingram narrative that the meeting concluded without any expression by Davis or McCarter as to the renewal of the note to become due on October 25, 1976. Ingram interpreted that silence to mean assent, and

assumed the $1,450,000 note would be renewed when due.

On *October 19, 1976*, Boatmen's invited the National Acceptance Corporation [a lender of last resort] to determine if Rigby could be refinanced. That would have entailed not only the assumption of the existent loan to become due on October 25, 1976, but an infusion of new money to provide working capital. Bugge, an officer of National Acceptance, Ingram and Regnier consulted, and after an examination of the books and inspection of the plant, National Acceptance declined the opportunity.

On *October 19, 20 and 21*, Ingram made a total of $102,000 in cash deposits into the Rigby account at Boatmen's, in response to the request for more capital by Brennan of Boatmen's [St. Louis] the week before.

On *October 21, 1976*, a Thursday, attorney Dicus for Boatmen's composed two letters of notice dated October 25, 1976: one to Ingram as president of Rigby, and one to Ingram, the person, as guarantor of the promissory note. The letters declared that the promissory note, principal and interest,[6] was due in full on October 25, 1976, that the note would not be renewed and that Boatmen's would exercise its rights under the security agreement to make full collection. The letter was delivered to Ingram personally by Boatmen's Vice President Regnier on the morning of October 25, 1976, the next Monday, between 8:00 a.m. and 9:00 a.m.

On *October 25, 1976*, after receipt of the notice letters from Boatmen's counsel, Ingram telephoned Rigby counsel, and counsel Dibble arranged a meeting with Davis, McCarter, Ingram, attorney Dibble for Rigby and Dicus and Dolson, counsel for Boatmen's. Ingram [for Rigby] had commenced consultation with Dibble some days before, and they discussed the possibility of voluntary bankruptcy for Rigby on October 22, 1976, the previous Friday, and Dibble commenced preparation of the petition in bankruptcy that weekend, before the notice and demand that the obligation of the promissory note was due. Dibble was concerned over that weekend that Boatmen's would not renew the note on October 25, 1976, and so was not surprised by the demand letters received by Ingram thereafter on October 25, 1976.

The end Dibble attempted to accomplish at the meeting was to extend the note and to secure additional funds for the continued Rigby operation. The fresh funds were essential to meet the "imminent danger that some of the larger creditors would put [Rigby] into an involuntary bankruptcy." Dibble reiterated the earlier proposal that the note be renewed and new funds added by the bank to enable the sale of Rigby— within ninety days—as a going business. The several hundred thousands of new dollars needed to keep the creditors at bay, to meet current payrolls and hence to allow time to negotiate a sale of the company, Dibble proposed come from accounts receivable pledged by Rigby to Boatmen's to secure the loan then due. Dibble acknowledged that, even under that plan, it "would have been a difficult job" to keep the creditors from "placing [Rigby] into involuntary bankruptcy." Boatmen's expressed the concern that the financial condition of Rigby considered, the Bank could not adequately protect its interests by allowing the business to continue operation for another ninety days. [And, indeed, as of that very day, according to Ingram, Rigby continued to lose $8,000 a day.] The Bank position was that an extension of the loan was possible only if Ingram supplied more securities as collateral on his personal guaranty. Ingram responded simply that he had no more securities to give. Boatmen's informed them the note was called and that [as narrated by Dibble] "they were then and there appropriating the contents of the lock box, and then and there putting the

---

**6.** The letters of notice and demand recite an indebtedness in the amount of $1,400,000 with accrued interest of $20,112.50. The promissory note instrument itself, dated September 25, 1976 and due October 25, 1976, however, recites an obligation of "One Million Four-Hundred Fifty Thousand Dollars" payable with interest at the rate of nine percent per annum. The evidence is conclusive that no payments were made on the promissory note.

account debtors on notice." Dibble informed Boatmen's that Rigby would file for bankruptcy the next day—October 26, 1976. Ingram retained the impression, nevertheless, even after the conclusion of those events, that the note would be renewed.

On *October 25, 1976, between 6:00 p.m. and 8:00 p.m.*, after the conclusion of the afternoon meeting convened by Dibble, McCarter telephoned Regnier [who had stood by for the call and kept the bank books open] with directions to offset the Rigby checking account—then, $158,083.26. The offset resulted in the dishonor of checks in the total of $86,662.67 over October 25 and October 26, 1976. The checks dishonored were marked "insufficient funds" by Boatmen's and returned to the several payees. There had been sufficient funds in the Rigby account prior to the offset, when the checks issued. On October 27 and 28, a total of $254,777.46 in checks were collected into the Rigby lock box. Boatmen's removed these checks, presented them for payment and credited the amount against the Rigby indebtedness. The amount of $158,083.26 setoff from the checking account was also credited against the Rigby loan.

On *October 26, 1976, Rigby filed for reorganization under Chapter XI of the Bankruptcy Act.* Rigby was designated Debtor in Possession. The proceedings were then converted to a liquidating bankruptcy and the Rigby assets were sold. On January 13, 1977, the Rigby loan was paid in full. The costs and fees were also paid in full from proceeds of the Rigby receivables after Boatmen's advanced additional funds for Rigby in bankruptcy to finish work in progress. The note and mortgage on the Rigby land [by then recorded] for $500,000 were satisfied in full on January 27, 1977, and released by Boatmen's. The stocks pledged by Ingram as additional collateral in response to the Boatmen's request were restored to him on November 9, 1977. After full payment of the obligation to Boatmen's, $92,729.21 remained for distribution to Rigby creditors.

### The Summary Judgment

The first amended petition, on which the judgment under review was entered, by the very title purports to present seven pleaded causes of action, each of them in tort: Conversion, Breach of Good Faith, Breach of Agency, Fraud and Misrepresentation, Unlawful Set-Off, Breach of Lock-Box Agreement, and Prima Facie Tort. The causes of action are pleaded in eight counts, each of which prays recovery of $5,221,000 actual and $10,000,000 punitive damages. The causes of action, as pleaded, all arise from the commercial loan transaction between Rigby and Boatmen's Bank & Trust Company of Kansas City and rest on allegations that the refusal of the lender bank to extend the promissory note otherwise due on October 25, 1976, and the manner the Bank exercised its collection remedies were tortious. The defendants Boatmen's and Bancshares made answer to the petition, counterclaimed against Rigby, and brought a third-party petition against Ingram. The pleadings were thereafter perfected, and discovery undertaken and concluded. That procedure entailed the depositions of the principal actors, other persons with knowledge of aspects of the transaction, and numerous bank experts. That voluminous testimony is recorded in more than three thousand pages of transcript, and includes several hundred exhibits. The defendants, in due course, moved for summary judgment on the ground that the pleaded claims presented no genuine issue of material fact. The motion was accompanied by numerous affidavits. Rigby responded with counter affidavits and other testimonial materials. The matter was fully briefed to the trial judge, and oral argument made. The court entered summary judgment for defendants on all the counts of the amended petition.

In the rendition of summary judgment, the opinion of the trial court determined that the first amended petition asserts four identifiable causes of action: conversion, breach of the duty of good faith, fraud and misrepresentation, and prima facie tort. The summary judgment adjudicates each of

those causes of action in favor of the defendants Boatmen's and Bancshares. On this appeal, Rigby does not contest that sense of the first amended petition, nor does Rigby contest the summary judgment as to the conversion cause of action. The appeal asserts error, rather, as to the judgment entered on Count III [Breach of the duty of Good Faith], on Count V [Fraud and Misrepresentation], and on Count VIII [Prima Facie Tort]. The summary judgment entered on the conversion cause of action [and on Counts II, IV, VI and VII, which articulate the tort, variously, in terms of wrongful seizure of Rigby checks, wrongful breach of agency duty as to those funds, wrongful setoff of those funds, and wrongful seizure of the lock-box checks], therefore, is not an issue on appeal and any error as to that adjudication is deemed abandoned. *American Lease Plans, Inc. v. Cardin*, 558 S.W.2d 325, 327[4] (Mo.App. 1977).

### The Obligation to Perform in Good Faith Under Sec. 400.1–203 and Sec. 400.1–208

Count III of the amended petition pleaded that § 400.1–203 and § 400.1–208 RSMo 1978, of the Uniform Commercial Code imposed upon Boatmen's Bank & Trust Company of Kansas City and Bancshares, Inc., the obligation to perform the terms of the promissory note in good faith, but that the defendants Bank and Bancshares intentionally and with malice [in the particulars pleaded] acted in bad faith and that the breach amounted to a tort. The pleader Rigby prayed for tort damages, compensatory and punitive, in the aggregate sum of $15,221,000. The trial court entered summary judgment on that count against the pleader on three grounds: (1) that the good faith provisions of § 400.1–203 and § 400.-1–208 do not intend a cause of action for the breach, (2) that § 400.1–208 does not

apply to any conduct of the Bank and Bancshares after the stated date of maturity of the promissory note—October 25, 1976, and (3) that the request for additional collateral, as a matter of law under the circumstances, was an act performed in good faith.

▇▇▇ The Uniform Commercial Code declares as the sine qua non of all transactions encompassed by the enactment [§ 400.1–203] that:

Every contract or duty within the Act imposes an obligation of good faith in its performance or enforcement.

That broad and percurrent principle is applied with particular color in specific provisions of the Act. Thus, *Option to accelerate at will* § 400.1–208 imposes the condition that:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral *"at will"* or *"when he deems himself insecure"* or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised. [original emphasis][7]

The Act renders as the general definition of the term [§ 400.1–201]:

Subject to additional definitions contained in the subsequent articles of this chapter which are applicable to specific articles or parts thereof, and unless the context otherwise requires, in this chapter:

(19) *"Good faith"* means honesty in fact in the conduct or transaction concerned. [original emphasis]

---

7. The promissory note and security agreement executed by Rigby to Boatmen's to evidence the obligation and ensure its payment provided for the acceleration of the debt and for additional security satisfactory to the Bank should the Bank, as to either, "deem itself insecure." Ingram subscribed his personal guaranty of the Rigby promissory obligation and also his personal pledge to furnish the Bank satisfactory collateral for the obligation, should the Bank deem itself insecure. The exercise by the Bank of its prerogative to accelerate the debt or to call for more collateral, therefore, was governed by the good faith condition of § 400.1–208.

The early drafts and versions of the general definition of *good faith* imposed the duty that contractors observe the reasonable commercial standards of the business or trade involved. Farnsworth, Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 U.Chi.L.Rev. 666, 673 (1963). The deletion of that component from the definition of the general obligation of good faith—and the absence of any other definition of the duty in acceleration of performance § 400.1–208—confines and delimits the reciprocal obligation of good faith between Rigby and Boatmen's Bank and Bancshares to the practice of *honesty in fact*, whatever the unreasonableness of that conduct by any commercial standard.[8] *Consolidated Public Water Supply District No. C–1 v. Farmers Bank*, 686 S.W.2d 844, 851[10–12] (Mo.App.1985).

Rigby contends that the general duty of good faith enacted by § 400.1–203 and accelerated performance § 400.1–208 of the Uniform Commercial Code, when breached, gives rise to an action in tort and enables recovery for tort damages, both as compensation and as penalty. Rigby contends, moreover, that the issue of the Boatmen's Bank and Bancshares lack of *honesty in fact* remains an issue of material fact, and hence was wrongly precluded by the order of summary judgment. We determine, rather, that, the record shows by unassailable proof that the Boatmen's and Bancshares conduct did not lack honesty in fact and that there remained no genuine issue of fact as to the good faith of the bankers throughout the transaction with Rigby. We determine also, and in any event, that the Code does not intend an independent cause of action *in tort* for breach of the good faith provisions Rigby pleads and asserts. Thus, the entry of summary judgment on Count III of the petition was proper. We consider and determine, neverthe-

less, the Rigby contention that the evidence presented by the record suffices to prove an issue of want of good faith, since that issue pervades other aspects of this appeal.

Rigby asserts that material questions of fact remain: whether the call of the promissory note on October 25, 1976 lacked honesty in fact, and whether the antecedent call upon Ingram for additional collateral also lacked honesty in fact, and hence breached the duty of good faith under § 400.1–203 and § 400.1–208. It is the Rigby contention, as to the call of the promissory note, that there was an agreement between Boatmen's and Rigby—formed at the October 17, 1976 meeting with bankers Davis and McCarter—to extend the loan on condition that Ingram furnish additional collateral. Hence, Rigby argues, the call on the loan on October 25, 1976, amounted to acceleration of the note—conduct subject to the good faith duty of § 400.1–208. Rigby argues also that the Boatmen's setoff of the funds on deposit against the debt was premature, and also amounted to an acceleration, and hence, also subject to the good faith duty of § 400.1–208. Rigby argues, as to the antecedent call for additional collateral, that the prospect of payment of the note was not impaired, and that, in any event, the collateral on hand was sufficient to ensure repayment, and hence the conduct of Boatmen's was not prompted by an honest belief, and breached the obligation of good faith under § 400.1–208. The court adjudicated that Boatmen's' conduct was not an acceleration of the Rigby note, and hence that the provisions of § 400.1–208 did not apply. The court adjudicated also that the unassailable proof demonstrated that the call for additional collateral was conduct honest in fact, and hence not in breach of the good faith obligation under § 400.1–208.

---

**8.** Thus, *good faith,* whenever used in the Code, means at least *honesty in fact in the conduct concerned.* In certain Articles additional requirements are imposed. *See* Official Comment to § 400.1–203. The *observance of reasonable standards* component deleted from the earlier versions of the general good faith definition of

§ 400.1–201(19), for instance, has been rendered into transaction in goods Article 2, so that, in the case of a merchant, *good faith* means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."

*Breach of the Agreement to Extend the Rigby Note as an Acceleration of Payment Not in Good Faith Under § 400.1–208*

■■■ Rigby contends [in the terms of the brief] that Boatmen's accelerated the debt "by demanding immediate payment for a loan which they had agreed to extend." We must note that there was no allegation in the petition, nor *any* proof, of any *agreement,* any meeting of minds, any terms of consensus between the bankers and Rigby to extend the note beyond the October 25, 1976 due date. The petition pleads, rather, in the separate count of fraud [Count V] a misrepresentation of an "intention to renew the note." That intention, the record shows [from repeated deposition testimony], Ingram garnered from the mere *silence* of the banker principals, Davis and McCarter, at the conclusion of the October 17, 1976 meeting. The evidence does not dispute that the promissory note for $1,450,000 with accrued interest was due by its terms on October 25, 1976. Rigby does not argue a new note or a written agreement to extend the debt, or even any such term, but only a perceived intention to contract, from silence. Thus, Rigby argues not bad faith performance of a subsistent contract, but bad faith negotiation for a *new* contract. The general good

faith duty under § 400.1–203, however, encompasses only the *performance and enforcement* of Code contracts. The premise of good faith § 400.1–203 is that each party to a Code contract will make effort—honest in fact—to meet the terms and spirit of the performance and enforcement obligations, and leaves the redress of bad faith negotiations and contract formation to established rules of fraud, duress and other causes for invalidation. § 400.1–103; Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization.* 67 Cornell L.Rev. 810, 838 (1982); Anderson, Uniform Commercial Code § 1–203:4 (3d ed. 1981). The trial court properly adjudicated—as a matter of fact—that the call of the note on October 25, 1976 did not amount to an acceleration [and hence was beyond the purview of the provisions and good faith duty imposed by § 400.1–208] and properly concluded—as a matter of law—that the banker bad faith the Rigby evidence tended to prove related to contract formation [and hence beyond the purview of general good faith § 400.1–203].[9]

*Premature Setoff as an Acceleration of Payment Not in Good Faith Under § 400.1–208*

The note by its terms was due on October 25, 1976. Boatmen's delivered notice

---

9. If we assume that somehow the Rigby contention relates not to formation, but to performance, of contract—and hence subject to the good faith provisions of the Code—nevertheless, the record allows no inference of issue of material fact that Ingram ever complied with the condition of the October 17, 1976 assent by silence [as perceived by Rigby] for the Boatmen's forbearance to call the debt when due—additional collateral. Ingram acknowledged repeatedly that the collateral demanded by bankers on his personal guaranty of the Rigby debt were marketable securities in the value of $200,000. The bankers repeatedly refused the radio station and the coin lockers because those assets were not readily marketable. The $500,000 mortgage on the Rigby land was refused for the additional reason that the transfer would be treated as a voidable preference in bankruptcy court.

Ingram argues that three events met the additional collateral condition of the tacit agreement to extend the loan: the first mortgage in the amount of $500,000 by Rigby on owned land to Boatmen's; a cash deposit made by Ingram to the Rigby bank account; and the pledge of

$140,000 in marketable securities by Ingram to Boatmen's. The *mortgage* [an action taken without request], however, was delivered to Boatmen's McCarter on *October 14, 1976* before the exchange of the tacit promises Rigby perceived from the October 17, 1976 meeting and was, in any event, a unilateral act by Rigby to bolster its own contractual obligation to give collateral and not given as security for the Ingram guaranty. The *$102,000 cash deposit* to the Rigby account [by the Ingram testimony] was not prompted by the October 17, 1976 meeting, but by the suggestion of Brennan [Boatmen's St. Louis] the week before, and had already been consummated by the time of the October 17th meeting. That deposit of cash, moreover, was not given in pledge of the personal Ingram guaranty but to allay the urgent Rigby need for operational capital. The *$140,000* in marketable securities, pledged as additional collateral on October 20, 1976, was delivered after October 17, 1976—but even that, as Ingram acknowledged, was short of the value demanded on October 17, 1976.

to Rigby and Ingram that the promissory note would be called on the due date. The notice prompted Ingram to instruct Rigby counsel Dibble to arrange a meeting with Boatmen's Davis and McCarter that very day. They met and counsel for the respective principals were in attendance. The Rigby petition in bankruptcy was already prepared. The purpose Dibble hoped to accomplish was for Boatmen's to extend the note and agree to fund the Rigby operations from the accounts receivable already pledged to Boatmen's—and hence to enable the sale of the business as a going enterprise. Rigby continued to lose at the rate of $8,000 per day [according to Ingram], and hence the Bank refused to continue the loan unless Ingram pledged more marketable collateral. Ingram responded simply that he had no more collateral to give. The meeting dissolved with the Boatmen's confirmance that the note was called, and that the contents of the lock-box [the accounts receivables] were appropriated. Dibble announced that Rigby would file for bankruptcy the very next day—October 26, 1976. The meeting ended after 6:00 p.m. on October 25, 1976, and then McCarter telephoned Regnier at the bank to offset the Rigby checking account—$158,083.26— against the debt. Rigby contends that under § 400.3–122, RSMo 1978, of the Code, "Boatmen's was not entitled to take any action with respect to the note until the next day, October 26, 1976." This premature act of setoff, Rigby argues, amounted to acceleration of the payment of the note and hence subjected the Boatmen's conduct to the good faith provision of § 400.1–208.

The provision Rigby cites does not control Boatmen's setoff transaction, nor does the good faith component of § 400.1–208 temper that conduct. That latter section, by its very terms, appertains to the acceleration of a debt not yet due. The section Rigby invokes to prove the untimeliness of the setoff—§ 400.3–122—appertains to the *accrual of a cause of action,*

and not the *acceleration of the payment of a debt.*

§ 400.3–122

(1) A cause of action against a maker or acceptor accrues

(a) in the case of a time instrument *on the day after maturity.* [emphasis added]

The Code [§ 400.1–201(1)] defines *action* as *in the sense of a judicial proceeding.* The setoff exercised by Boatmen's, however, was not as an incident of a judicial proceeding, but of a nonjudicial, self-help right of contract. The Rigby note reserved to Boatmen's the right "to offset funds held by [the] Bank against matured debts owing to [the] Bank." That provision expresses the general principle of the law merchant, antecedent to the Code or other enactment, of the right of a bank to setoff the deposits of a debtor against a matured indebtedness. That right derives from a subsistent relationship of creditor and debtor between a bank and depositor and expresses principles of equity. *Adelstein v. Jefferson Bank and Trust Co.,* 377 S.W.2d 247, 251[1] (Mo.1964); *Muench v. Valley National Bank,* 11 Mo.App. 144, 150 (1881).

The question, then, is not whether a cause of action had accrued to Boatmen's [in the Code sense of a judicial proceeding] but whether the Rigby debt was mature and hence the right of setoff had accrued. An instrument, which by its terms is payable on a fixed date, matures on that date. The Rigby note was payable on October 25, 1976, and matured on that date. It was, by its terms, payable on that business day at the office of the payee bank. *"Banking day"* means "that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions." § 400.3–102 and § 400.4–104, RSMo 1978. Thus, the Rigby note was payable to Boatmen's during the normal hours for the transaction of bank business that day, and was in default thereafter.[10]

**10.** The contention Rigby raises against the validity of the setoff was, in fact, conceded by the deposition testimony of its counsel, Dibble: "Assuming the note was due and payable on the 25th, as I recall it was, and assuming it wasn't paid by the end of the ordinary business day,

There is no dispute that Rigby never made or attempted tender of payment to Boatmen's during business hours on October 25, 1976. There is no dispute that the Boatmen's exercise of setoff was after the regular business hours of the bank on that day—after the indebtedness on the note matured into default. The principle in Missouri that a bank may resort to the self-help remedy of setoff against a depositor in default on the same day that an obligation matures is as venerable as *Muench v. Valley National Bank*, 11 Mo.App. 144 (1881).

Rigby cites two cases from other jurisdictions for the proposition that a creditor bank may not institute self-help remedies against a debtor depositor until the day after the day of maturity—that is, until a right to a judicial action has accrued against a maker of a note under § 400.3–122 of the Code. *Marine Midland Bank-New York v. Graybar Electric Co.* 41 N.Y.2d 703, 395 N.Y.S.2d 403, 363 N.E.2d 1139 (1977) adopted "as a matter of commercial policy" the rule that a creditor bank may not exercise any remedy—judicial and nonjudicial alike [setoff included]—"until the day following the day on which the obligation is due an [sic] payable." *Id.* 395 N.Y.S.2d at 407, 363 N.E.2d at 1143. The New York court acknowledged that no local precedent imposed such a rule, and that no clear sense of Code § 400.3–122 directed it, but adopted the procedure to allow competitor creditors to the depositor fund a parity with the bank. *See also Bethelehem Acceptance Corp. v. Ed Newman Motor Co.*, 230 Pa.Super. 441, 331 A.2d 497 (1974). Whatever the validity of the New York decision as a local policy, the rationale disrupts the special role of a bank as lender which our law protects and thwarts the equity the setoff remedy is fashioned to accomplish. Thus, our law not only enables a creditor bank to setoff the debt of a depositor on the date the note matures and comes into default, but also even before, on evidence that the debtor is insolvent. *Muench*, 11 Mo.App. at 150:

"[I]n equity ... when the depositor ... died before the note matured, upon evidence of danger of insolvency of the estate ... the bank ought to be allowed to retain of the funds of the depositor in its hands enough to meet the note when due."

■■■ On these principles, the exercise of setoff by Boatmen's on the date the note was due, and after the conclusion of the business hours of the bank where payment was directed was, as to a promissory obligation, both mature and in default, so that neither the acceleration nor the good faith provisions of § 400.1–208 apply. On these principles also, the circumstances of an acknowledged insolvency of the depositor and announcement by Rigby counsel of the imminent Rigby bankruptcy at the October 25, 1976 meeting entitled Boatmen's, as a matter of equity, to retain the Rigby deposits already in its hands to apply against the debt, even if in advance of technical default. *Muench*, 11 Mo.App. at 150; *Jensen v. State Bank of Allison*, 518 F.2d 1, 5[7, 8] (8th Cir.1975). The summary judgment against the contention that the setoff amounted to an acceleration and was governed by the good faith provision of § 400.-1–208 was properly adjudged.

### The Demands for Additional Collateral and the Good Faith Provision of Section 400.1–208

The issue of acceleration apart, Rigby contends that the demands for additional collateral when the value of the security already pledged was greater than the indebtedness presented a genuine issue of fact—the honest belief of the bankers under § 400.1–208 that the prospect of payment of the Rigby note was impaired—so as to preclude summary judgment on Count III. The order of summary judgment rejected these contentions on the alternative grounds: (1) The demand for more collateral was to Ingram as guaran-

which it was not, then thereafter it was in default and then it is my opinion and belief that

the bank had a right of setoff at that time."

tor, and not to Rigby as debtor, and hence Rigby was not aggrieved and does not stand to complain; (2) The demands for additional collateral, in any event, were actions honest in fact under all of the unrebutted proofs of the dire Rigby financial straits. We assume for purpose of opinion that there was sufficient identity of interest between the Rigby promissory indebtedness and the Ingram guaranty of that indebtedness, so that an unfair demand for more security of that guaranty which causes the call for payment of the debt, aggrieves not only the guarantor but the promissory debtor as well. We agree with the summary judgment, nevertheless, that no genuine issue of material fact subsists as to the good faith of the Boatman's conduct and that the calls for additional collateral for the guaranty were, as a matter of law, honest in fact, and so within the sanction of § 400.1–208.

Rigby disputes that the determination of the summary judgment that "the debt was undercollateralized and the prospect of payment impaired" was shown by unassailable proof, and hence Boatmen's call on Ingram to further secure his guaranty of the debt was in good faith. Rigby argues that an entry in the bank credit file on October 20, 1976, a mere five days before the call of the loan, notes a $242,230.38 "cushion" of collateral, even in addition to the $500,000 Rigby mortgage and the $140,000 in marketable securities Ingram assigned to Boatmen's. Thus, the argument concludes, the "prospect of impaired payment" [which § 400.1–208 posits as a precondition to a good faith call for additional collateral] the trial court found was without basis in fact and the good faith of the call on Ingram for additional security on his guaranty was an issue yet in dispute, and not amenable to summary judgment.

The argument rests on mistaken premises, both of fact—as to what the record shows—and of law—as to what *good faith* means in terms of § 400.1–203 and § 400.-1–208. The credit file entry the argument cites alludes to the memorandum of Boatmen's Vice-President Regnier. That entry was dated *September* 20, 1976, and not *October 20*, 1976, as Rigby mistakenly asserts. That memorandum reports information given by Menze, the Rigby financial officer, to Regnier. It reports that as of *August 30*, 1976, the outstanding loan was $1,175,000 secured by eligible collateral of $1,668,799.30—or a margin of $493,799.30 of collateral over loan. It reports also that "[a]t the present time"—*September 20*, 1976, the outstanding loan was $1,400,000 secured by eligible collateral of $1,642,-230.38—or a margin of $242,230.38 of collateral over loan. The information that undisputed exhibit evidence discloses is that by then—*September 20*, 1976, the debt continued to mount and the collateral [Rigby accounts receivable and inventory] continued to shrink. It will be noted also that the mortgage from Rigby to Boatmen's [albeit uninvited] was not conveyed until *October 14*, 1976.

The undisputed evidence—all of it from the Ingram testimony and from uncontested exhibits—shows that by the end of September, 1976, when Regnier first made demand on Ingram for $200,000 added collateral, through October 12, 1976 and October 17, 1976, when Brennan in St. Louis and then Davis and McCarter in Kansas City repeated the call for the added marketable securities, the Rigby labor strife continued unabated with consequences of lost production, lost customers, lost receivables, and lost profits. The accrued loss for year 1976 was $1,132,859 by the end of September and, as Ingram informed the bankers on October 17, 1976, Rigby had already accumulated a $200,000 loss for that October, and was continuing to lose money at the rate of $8,000 per day. Rigby, moreover, projected losses "in excess of $125,-000 to $150,000 in November and December" of the year. Ingram on October 17, 1976, also repeated the urgent and immediate need for fresh money to forfend the creditors and to prevent involuntary bankruptcy. The need was $500,000 for October and $400,000 to $500,000 for November—and that, just to enable Rigby to survive as a business. The record shows, also without dispute, that one of the prime as-

sets which secured the Rigby loan—the accounts receivable—had declined from $1,677,351 on February 27, 1976 [on an outstanding loan of $500,000] to $736,455 on October 5, 1976 [on an outstanding loan of $1,145,000]. The Ingram testimony was also that by October 17, 1976, Ingram was left with the hope that Rigby could be sold—but that would require about ninety days. It was to that end that Ingram appealed to the bankers at the meeting of that date for not only the renewal of the note, but for additional new money to meet the expenses of operation during the quest for a buyer. Ingram acknowledged that although the bankers were silent as to the renewal of the note: "There was no indication that there would be no renewal of the note, which was coming due on October the 25th," there was nothing said to lead Ingram to believe that Boatmen's would loan Rigby the additional $500,000 needed to keep the company in operation during that October and a like sum for November. The Ingram testimony was also that at that final meeting on October 25, 1976, when the note was due and had been called,

Boatmen's still held out the renewal of the note on condition that Ingram furnish more marketable securities, but he had no more to give: "If I had any, I would have brought them in." Ingram acknowledged that by October 25, 1976 the more than $7,000,000 in owned marketable shares and bonds listed in the statement of personal worth submitted by Ingram to Boatmen's with the application of the loan were all pledged or otherwise committed by him to other banks and on other loans.

█ These were the unassailable facts before the trial court, articulated most favorably to Rigby against whom the summary judgment was rendered, and it is in that perspective that our review determines whether the Boatmen's refusal to renew the Rigby note for the Ingram failure to give more collateral was an act not in good faith. *First National Bank v. Chemical Products, Inc.*, 637 S.W.2d 373, 375[1–4] (Mo.App.1982). Thus, the narration, and our determination of the validity of the summary judgment, excludes the replete aspects of the record which favor the judgment.[11]

11. Among them:

The McCarter deposition testimony that Boatmen's made the loan on the basis of the Ingram personal worth statement which represented a net worth of $9,756,000 and owned market shares and bonds of a value in excess of $6,000,000—and had Boatmen's known that the bulk of those assets were already pledged and committed, the bank would not have made the loan, or at the least, would have required Ingram to secure a guaranty when made. The fact that the shares were already encumbered was not shown on the form, although called for. McCarter and the other bankers began to doubt the validity of the financial statement after Ingram failed to respond to repeated requests for more market shares collateral.

The Ingram testimony that the financial statements of personal worth were documents, not certified, but prepared by his wife and that the values attributed to the assets were his own estimates.

The deposition testimony of McCarter and Regnier that they learned from Rigby financial officer Menze that Ingram planned to "break the union," a plan already formed at the time of the loan, but undisclosed to Boatmen's, which if then known, would have foreclosed issuance.

The Ingram deposition testimony that the consolidated financial statement for Ingram Enterprises/Rigby at the end of year 1975 dis-

closed a *deficit* net worth of $944,873, but that information was not disclosed to Boatmen's at the time of the loan and not until October of 1976.

The McCarter deposition testimony that the Ingram Enterprises/Rigby consolidated financial statement, finally received in October of 1976 after months of request, disclosed a *deficit* net worth of $3,000,000 for the combined operations. That report indicated [in the terminology of bankers McCarter and Davis] that during 1976 $733,576.82 was "siphoned upstream" from Rigby to Ingram Enterprises. Ingram described the transfers as "advances," but acknowledged that Boatmen's was never advised of his transactions.

The testimony of Brennan, McCarter and Regnier that they repeatedly advised Ingram the bank would not continue the loan after October 25, 1976, unless Ingram pledged the requested market securities as added collateral.

The Ingram testimony that he knew the bank expected more in marketable collateral than the $140,000 furnished and that he thought such a request neither "unfair or unreasonable."

The deposition testimony of McCarter and bank attorney Dolson that Boatmen's offered to advance funds to meet the payroll to enable Rigby to complete $800,000 worth of work in progress—and hence to enable an orderly liqui-

The effect of the general duty of good faith § 400.1–203 is to require that in the performance or enforcement of every commercial contract "what is not regulated by the contract should be done in such a way as to show good faith in the carrying out of what is expressed." Anderson, Uniform Commercial Code § 1–203:3 (3d ed. 1981). It implies as a term in every contract "the cooperation of one party where it [is] necessary in order that the other might secure the expected benefits of the contract." Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code*, 30 U.Chi.L. Rev. 666, 672 (1963); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138[7, 8] (5th Cir.1979), *reh'g. denied*, 597 F.2d 772, *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198. In the performance of a commercial contract, therefore, a party who evades "the spirit of the deal," and so denies to the other the benefit of the contract, commits a breach, even though the evasive conduct is within the letter of the agreement. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 Va.L.Rev. 195, 234 (1968).

It is the sense of the Rigby contention that the Boatmen's refusal to renew the promissory note on October 25, 1976, for the Ingram failure to give more collateral—although the note was due and hence by its terms subject to call—evaded the spirit of the agreement to keep the credit line open so long as the security exceeded the indebtedness, and hence breached the good faith obligation of § 400.1–208. That section empowers a secured creditor to demand additional collateral "only if he in good faith believes that the prospect of payment or performance is impaired." Rigby argues that the payment was not, in fact, impaired—or, at least, there was a sufficient issue of an actual impairment to pay to preclude summary judgment.

■ The *good faith* term § 400.1–208 employs is the general obligation of good faith § 400.1–203 declares as the sine qua non of the Code and which § 400.1–201(19) defines as *honesty in fact in the conduct or transaction concerned.* It is a standard of good faith conduct less stringent than the commercial reasonableness and fair dealing Sales Article 2 requires of merchants, and more subjective. § 400.2–103(1)(b). *United States v. Cain*, 736 F.2d 1195, 1197 (7th Cir.1984); *Van Bibber v. Norris*, 275 Ind. 555, 419 N.E.2d 115, 122[2] (1981); *Van Horn v. Van De Wol, Inc.*, 6 Wash.App. 959, 497 P.2d 252, 253 (1972); Braucher, *The Legislative History of the Uniform Commercial Code*, 58 Col. L.Rev. 798, 812 (1958). In terms of insecurity § 400.1–208, accordingly, a creditor acts in good faith who acts on what he believes he knows, whether or not what he believes is actual. *Fort Knox National Bank v. Gustafson*, 385 S.W.2d 196, 200[1] (Ky.1964); *Van Horn v. Van De Wol, Inc.*, 497 P.2d at 254[1]. It is enough that the creditor honestly believes that the payment of the debt is impaired to act with good faith in the call for more collateral under § 400.1–208. *Smith v. Union State Bank*, 452 N.E.2d 1059, 1064[11, 12] (Ind.App. 1983). To act with *honesty in fact* in the call for more collateral, and hence in good faith under § 400.1–208, however, is to act without caprice or arbitrary purpose. *Ginn v. Citizens and Southern National Bank*, 145 Ga.App. 175, 243 S.E.2d 528, 530[2] (1978). That is to say, the belief of insecurity which prompts the call for more collateral may not be bereft of rational basis nor amount to an open abuse of that discretionary power. *K.M.C. Co. v. Irving Trust Company*, 757 F.2d 752, 761[15], n. 2 (6th Cir.1985).

In the perspective of these principles, the call by Boatmen's for Ingram to secure his guaranty with more collateral was, as a

---

dation—but the refusal by Rigby on the ground that unless the suppliers were also paid, involuntary bankruptcy would be induced. The deposition testimony of McCarter that the setoff was not ordered until attorney Dibble

announced at the conclusion of the October 25, 1976 meeting that Rigby would commence proceedings for voluntary bankruptcy the next day.

matter of law, honest in fact and on the good faith belief that repayment of the Rigby loan was impaired. This follows from the undisputed facts and other evidence asserted by *Ingram* against the entry of summary judgment. The record shows conclusively, unrelieved by *any* evidence, that Boatmen's acted from an honest belief that the continued deterioration of the Rigby operation, still beset by strike, diminished business, loss of profits and accumulated debts imperiled the repayment of the loan about to become due. Rigby argues that good faith remains an issue of fact because the security—the Rigby receivables and inventory and the Ingram collateral already given—exceeded the indebtedness. The amount to become due on October 25, 1976 was $1,450,000 plus another $20,000 or so in interest. The "cushion" Rigby cites [existent in September of 1976 before the call for the collateral Rigby cites as an act in breach of good faith] was $242,230.38 with the $140,000 Ingram later provided in market shares—or some $400,-000. The losses mounted in October, however, already to the sum of $200,000 at the time of the October 17, 1976 meeting, and still continued at the rate of $8,000 per day. This was all evidence given by Ingram and the most favorable available to him on that aspect of the transaction. The losses, by his own estimate to the bankers, moreover, were expected to continue into November and December. The major suppliers, also, were restive and threatened bankruptcy unless they were paid, and Rigby was without source for new money to pay them.

Those circumstances, from the very mechanics of the line of credit undertaking, augured the depletion of the Rigby security [receivables and inventory] without prospect of replenishment. It was futile for Boatmen's to call on Rigby for other collateral since, even if available, the transfer would be subject to avoidance in bankruptcy as a preference. Thus, only the guarantor Ingram was amenable—in any practical sense—to Boatmen's contract right to call for more collateral. Rigby does not suggest what the expected disparity would be between the Rigby collateral already in

hand [receivables and inventory] plus the $140,000 in shares pledged by Ingram and the indebtedness at the end of November of 1976, had not the note been called on October 25, 1976, when due. That the impairment of repayment of the note would have been exacerbated is self-evident from circumstances of the continued Rigby strike, the continued losses at $8,000 per day, and no source for new money. The belief that the payment of the Rigby debt was impaired was, as a matter of law, neither capricious, arbitrary, nor lacking in rational basis, and hence no material issue of genuine fact of Boatmen's want of good faith in that transaction under § 400.1–208 remained for determination. Summary judgment was properly adjudicated. *Van Bibber v. Norris*, 275 Ind. 555, 419 N.E.2d 115, 125[7] (1981); *Fort Knox National Bank v. Gustafson*, 385 S.W.2d 196, 200[1] (Ky.1964); *Van Horn v. Van De Wol, Inc.*, 6 Wash.App. 959, 497 P.2d 252, 254[2] (1972).

Rigby contends, nevertheless, that the trial court neglected the deposition evidence of banker-witnesses Johnson and Barry that, in fact, the loan was not "undercollateralized," and hence the call on Ingram collateral was not in good faith. The issue, however, was not the actual sufficiency of the security, but whether Boatmen's honestly believed an existent insufficiency at the time it acted. The record concludes that issue against Rigby as a matter of law for the reasons given.

■ The contention of Boatmen's want of good faith under § 400.1–208 in the conduct of the transaction is precluded against Rigby as a matter of law on a separate ground. The Rigby want of good faith argument, although posed as a call on Ingram for collateral when the repayment of the note was not actually impaired, and hence a call not honest in fact, transcends that asserted basis for the breach and good faith. The only consequence to *Rigby* of the Boatmen's call upon Ingram—and the inability of Ingram—to furnish additional collateral was the nonrenewal of the promissory note due for payment on October 25,

1976. Thus, by any real view of the contention and in very effect, it was the nonrenewal of the note which could have constituted the act of bad faith. There is no contention that the call for collateral and the consequent nonrenewal of the note was an evasion of the spirit of the transaction for the line of credit, and hence an act not in good faith under the Code. The line of credit was for an amount up to $1,500,000 —on condition of Rigby collateral and the Ingram guaranty. On October 25, 1976, $1,450,000 was due on the note plus accrued interest of about $20,000. Thus, the line of credit was already exhausted. The note by its terms was due unconditionally after maturity on October 25, 1976. There was a duty of good faith on the *performance* of that promissory undertaking on both parties—Rigby and Boatmen's. The performance of the line of credit undertaking was completed, if for no other reason than that the full line of credit was extended—impairment or nonimpairment of payment notwithstanding. The note became due according to its terms. There was no duty of good faith on Boatmen's to extend the loan or to forbear enforcement. "The obligation to act in good faith does not bar a party from enforcing whatever legal rights he possesses. In the name of good faith, a party can not be required to forego or surrender a right that he otherwise possesses." Anderson, Uniform Commercial Code § 1–203:11 (3d ed. 1981); *Missouri Public Service Co. v. Peabody Coal Co.,* 583 S.W.2d 721, 725[2] (Mo.App.1979), *cert. denied,* 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88.

The trial court properly entered summary judgment against the Rigby contention of a breach of the obligation of good faith under § 400.1–208.

*The Breach of the § 400.1–203 and § 400.1–208 Duty of Good Faith as the Basis for a Cause of Action*

Count III of the Rigby petition pleaded that § 400.1–203 and § 400.1–208 of the Code imposed on Boatmen's and Bancshares the obligation to perform the terms of the promissory note and security agreement in good faith, but that the Bank and Bancshares intentionally and with malice [in the particulars pleaded] acted in bad faith and that the breach amounted to a tort. The prayer was for tort damages, compensatory and punitive, in the aggregate sum of $15,221,000. The trial court entered summary judgment on that count against Rigby on three grounds—two of them already discussed and sustained—and on the ground, as well, "[t]hat the good faith provisions of §§ 400.1–203 and 400.1–208 do not provide the basis for an independent cause of action."

Rigby argues that the express declaration of § 400.1–203: "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement," conjoined with the declaration of § 400.1–208 [which has immediate reference to § 400.1–203], that a party may require additional collateral "only if he in good faith believes that the prospect of payment or performance is impaired," gives rise to a cause of action in tort for the breach. Any other conclusion, Rigby argues, reduces the statutory duty of good faith to verbiage and babble, and leaves a party injured bereft of remedy. The sense of the Rigby argument is that these statutes impose a duty of fairness according to community standards, quite apart from any duty of contract, and an obligation to respond in tort damages for the breach—both compensatory and punitive. The sense of the summary judgment is that these statutes impose neither a tort duty nor a contract duty—and that the good faith declarations are no more than directives. The Code expressly dispels both premises:

The administration of remedies § 400.1–106 reads:

(1) The remedies provided by this chapter shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but *neither consequential or special nor penal damages may be had except*

*as specifically provided in this chapter or by other rule of law.*

(2) *Any right or obligation declared by this chapter is enforceable by action unless the provision declaring it specifies a different and limited effect.* [emphasis added]

The Code, therefore, imposes the duty of good faith in the performance or enforcement of a contract within its terms [§§ 400.1–203 and 400.1–208], allows a remedy for the breach [§ 400.1–106(2)], and confines damages and redress—to restore the party aggrieved to as good a position as if the other party had fully performed [§ 400.1–106(1)]. The Code, however, expressly disallows *consequential, special or penal damages,* except as the Code *or other rule of law* may provide. The Code, however, provides for no other remedy for a breach of the obligation of good faith under § 400.1–203 and § 400.1–208, than to be restored to the *status quo ante,* and Rigby pleads no cause of action for breach of the duty of good faith except under the Code. The declaration in § 400.1–106 as to the objective of Code remedies "is a restatement of the common-law theory of contract damages." 1 R. Anderson, Uniform Commercial Code § 1–106:9 (3d ed. 1981). The obligation of good faith appertains to the performance or enforcement of every *contract* duty under the Code. § 400.1–203. The remedy for breach of the obligation of good faith under the Code, §§ 400.1–203 and 400.1–208, accordingly, is a contract, and not a tort remedy. *See Nobs Chemicals, U.S.A., Inc. v. Koppers Co.,* 616 F.2d 212, 215[3, 4] (5th Cir.1980); *Interco, Inc. v. First National Bank,* 560 F.2d 480, 485 (1st Cir.1977); *Allied Canners & Packers, Inc. v. Victor Packing Co.,* 162 Cal.App.3d 905, 209 Cal.Rptr. 60, 65 (1984); *Hall v. Owen County State Bank,* 175 Ind.App. 150, 370 N.E.2d 918, 927 (1977); *Waters v. Trenckman,* 503 P.2d 1187, 1191 (Wyo.1972).

Although the Code expressly, and as a matter of policy, refuses to intrude penal damages into the usual commercial transaction, a proviso of the administration of remedies § 400.1–106(1) enables a party aggrieved by a breach of a Code obligation to resort to *other rule of law,* that is, to non-Code law, for such redress. *Fousel v. Ted Walker Mobile Homes, Inc.,* 124 Ariz. 126, 602 P.2d 507, 510[8] (App.1979); *Kendall Yacht Corp. v. United California Bank,* 50 Cal.App.3d 949, 123 Cal.Rptr. 848 (1975); *Yacht Club Sales and Service v. First National Bank,* 101 Idaho 852, 623 P.2d 464, 475[11] (1980).[12] Thus, it was

---

**12.** A few decisions, and Rigby cites them, give ostensible approval to a tort cause of action and damages under the Code for the breach of good faith obligation §§ 1–203 and 1–208—*Skeels v. Universal C.I.T. Credit Corp.,* 335 F.2d 846 (3rd Cir.1964); *First National Bank v. Twombly,* 689 P.2d 1226 (Mont.1984); and *McKay v. Farmers and Stockmens Bank of Clayton,* 92 N.M. 181, 585 P.2d 325 (App.1978) *cert. denied; Farmers & Stockmens Bank v. McKay,* 92 N.M. 79, 582 P.2d 1292. None of these decisions confronts administration of remedies § 1–106, nor otherwise expounds a rationale consonant with that integral rationale of the Code.

*Skeels,* a federal court decision which undertook to apply Pennsylvania law, is not only more sensibly understood in terms of a non-Code, *other law,* remedy based on fraud or promissory estoppel, but was peremptorily contradicted by a later federal decision, *Iron Mountain Security Storage Corp. v. American Specialty Foods, Inc.,* 457 F.Supp. 1158 (E.D.Pa.1978) which holds unequivocally that Pennsylvania does not allow a tort recovery for breach of a Code contract duty of good faith in an ordinary commercial transaction.

*Twombly* allows the tort and punitive damages on the premise that the Code § 1–203 duty of good faith [at 1230] "is imposed by law rather than the contract itself"—all without notice that administration of Code remedies § 1–106 does not allow penal damages, confines a recovery for the breach of a Code obligation—§ 1–203—to the contours of a contract breach, and hence that § 1–203 imposes a duty of contract, and not of tort.

*McKay* deals only with the quantum of evidence needed for a summary judgment of the good faith issue under acceleration of payment § 1–208 of the Code. The action for the breach of that good faith obligation was brought in tort, but the validity of such a remedy for the good faith breach was neither presented, nor resolved, but merely assumed.

Those courts which have considered the question, or which have otherwise given notice to § 1–106, refuse approbation to a tort of bad faith for the breach of §§ 1–203 or 1–208 and punitive damages as expressly beyond the re-

open to Rigby to assert the tortious breach of the contract obligation and, upon evidence, recover consequential and punitive damages, if our non-Code law provides such a remedy. Count III of the Rigby petition neither pleads nor invokes any rule of law other than a remedy under the Code. The petition, the assertions to the trial court, and now to us on appeal, insist only for a tort remedy and punitive damages as the redress for the breach of the obligation of good faith in the performance of the security agreement contract.[13] The Code confined remedy for the breach of the good faith obligation under § 400.1–203 and § 400.1–208 to the contours of a contract cause of action. Count III of the Rigby petition which asserts a tort cause of action and tort damages under the Code for the breach, therefore, did not state a claim and was properly adjudicated by summary judgment.[14]

dress § 1–106 of the Code allows for the breach of a Code obligation. *Kennedy Electric Co. v. Moore-Handley, Inc.*, 437 So.2d 76 (Ala.1983); *Fulton National Bank v. Willis Denney Ford, Inc.*, 154 Ga.App. 846, 269 S.E.2d 916 (1980); *Mason v. Farmers Insurance Co.*, 281 N.W.2d 344 (Minn.1979); *See also, among others Fousel v. Ted Walker Mobile Homes, Inc.*, 124 Ariz. 126, 602 P.2d 507 (App.1979); *Hall v. Owen County State Bank*, 175 Ind.App. 150, 370 N.E.2d 918 (1977); *First Security Bank v. Utah Turkey Growers, Inc.*, 610 P.2d 329 (Utah 1980).

13. The other counts of the Rigby petition, in fact, pleaded the promissory note and security agreement transactions to assert tort causes of action under *other law*, non-Code law, and to recover consequential and punitive damages. These counts pleaded, variously, conversion, prima facie tort, and fraud. The counts were all adjudicated against Rigby as a matter of summary judgment, and, as we note, the prima facie tort and fraud adjudications are presented for review, as well as the good faith count just concluded.

Our non-Code, *other law*, also recognizes a general obligation of good faith and fair dealing in the performance and enforcement of contracts [*Craig v. Iowa Kemper Mutual Insurance Co.*, 565 S.W.2d 716, 722 (Mo.App.1978); Restatement (Second) of Contracts § 205 (1981) ], and implicitly recognizes a *contract* remedy for the breach [*Bigelow-Sanford Carpet Co. v. Missouri Furniture, Inc.*, 349 S.W.2d 43, 47 (Mo. 1961) ]. Our non-Code law does recognize that where the contract places the contractors in a special relationship or status which the law protects, the breach of the contract obligation of good faith gives rise to an action in tort independent of the contract. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750, 753[2] (1950). Rigby neither pleads a non-Code breach of good faith obligation nor invokes this *other law* for the tort damages Count III attempts.

14. *Response to the Dissent*

I add this response to the dissent to that which the concurring opinion of Pritchard, J., ably formulates and expresses.

The dissent disagrees only with the summary judgment entered on Count III—Breach of the Obligation of Good Faith under § 400.1–203 and § 400.1–208, not because honesty in fact and hence good faith of the bankers was not shown as a matter of law was not shown as unassailable proof as to the matters Count III pleads, the summary judgment adjudicates, and Rigby briefs and contends to this court, but because the dissent discerns that a tort of wrongful dishonor of checks on the occasion of the setoff by the bankers "was incorporated by reference into Count III" and, presumably became an issue on appeal-albeit not raised on appeal by Rigby and albeit any such cause of action was already concluded by the unappealed summary judgment on Count VI.

The trial court entered summary judgment against Count III under the pleadings and the undisputed evidence on multiple grounds. Rigby and the others appealed and raised as points that the breach of these good faith provisions intends a cause of action in tort, and for recovery of compensatory and punitive damages. Rigby and the others raised also that there remained issues of fact which precluded summary judgment on Count III—among them, that *the Boatmen's setoff against the checking account was premature since the indebtedness on the note had not yet matured, and therefore was an act not in good faith and amounted to an acceleration of the debt.*

The majority opinion determines that the breach of these good faith sections of the U.C.C. does not intend a cause of action in tort [the only remedy the plaintiffs ever sought] and that the conduct of the bankers in every particular contested, was on the undisputed evidence honest in fact, and hence not a breach of the good faith obligations. As to the Rigby contention that at the time the setoff was exercised by Boatmen's, the debt was not yet in default, and hence the right of setoff had not yet accrued, and its exercise constituted an act not honest in fact, and so in breach of the good faith provisions of § 400.1–203 and § 400.1–208 of the U.C.C., the majority opinion responds: the undisputed evidence was that the promissory note by its own terms was due and payable at the bank on October 25, 1976, and hence came into default at the end of the regular business hours on that day—and the undisputed evidence was also that the setoff was exercised after six p.m.

## FRAUD

Count V of the first amended petition undertook to plead a claim for fraud. The cause of action was articulated as a false representation by Boatmen's to Rigby of intention to renew the note, in accordance to past practice, when it fell due, when Boatmen's had already decided to call the note for payment at maturity and to exercise collection remedies. The trial court in its memorandum of summary judgment cited the Ingram deposition testimony—a

on October 25, *after* the conclusion of the usual business day, and hence the setoff was fully matured at the time of its exercise and exercised in good faith as a matter of law.

The dissent does not disagree that the right of setoff was mature at the time the bankers exercised that right against the Rigby checking account. It seems to assert that although the right to setoff was mature when exercised, it was exercised wrongly. That is—*that a matured right of setoff notwithstanding, the evidence as to the manner of its exercise gave rise to an issue as to whether the payor bank, Boatmen's, had not already posted, as paid, the check drawn on the Rigby account so that the setoff amounted to a wrongful dishonor of those checks*—a cause of action, not as a matter of law and unassailable proof of fact foreclosed against Rigby, and hence Count III was still open for adjudication. The dissent acknowledges that "[t]he brief of the Rigby Corporation does not advance the analysis set forth above"—and with good cause.

That is simply because the complaint of want of banker good faith in the exercise of the setoff Count III pleads, asserted to the trial court, and now briefed and presented to this court on appeal, is on the ground of that the right to setoff had not yet accrued to Boatmen's because the Rigby debt was not yet in default, and not on any ground—as the dissent gratuitously insinuates—that the setoff, although accrued, was exercised in such a manner as to work the wrongful dishonor of the checks under § 400.4–402 of the U.C.C. The court of appeals confines review solely to points *briefed,* and that principle governs whether the case was tried to the court or to a jury. *Kurtz v. Fischer,* 600 S.W.2d 642, 645[1] (Mo.App.1980); Rule 84.04(d).

The role of an appellate court is to examine *assertions of error.* Advocacy is left to counsel. Our rules of appellate procedure are designed to ensure that separation of function, and in the process, to fulfill the important policy of impartial decision which informs those rules. *Thummel v. King,* 570 S.W.2d 679, 686[8–10] (Mo. banc 1978). The first, and fundamental prerequisite for appellate review and decision, of course, is the contention of error—the point relied on [Rule 84.04(d)]. It serves, not only to give notice to the adversary of the matter in contention and to be given response, but also informs the court of the issue presented for decision. *Thummel v. King,* 570 S.W.2d at 686[6, 7]. The point relied on, therefore, defines the issue and circumscribes review. Accordingly, a court of appeals, conformable to its role as arbiter of a claim of error, simply is not authorized to consider a point other than those formally presented. *School District of Springfield v. Transamerica Insurance Company,* 633 S.W.2d 238, 253[20] (Mo.App.1982).

The points relied on in the Rigby brief as to the summary judgment entered against Count III assert error in the adjudication that, as a matter of unassailable proof, the banker conduct, in the numerous particulars, did not breach the obligation of good faith under § 400.1–203 and § 400.1–208 of the U.C.C. and in the adjudication that such a breach was not actionable. There is no mention in the points relied on—or for that matter in the pleaded Count III—of a wrongful dishonor of Rigby checks or of § 400.4–402 [which the dissent would insinuate into Count III]. Nor does any of the recitation of the line of credit transaction, rendered as Count I of the Rigby petition, mention § 400.4–402—so as to be "incorporated by reference" into pleaded Count III—the device the dissent would employ to revive Count III as presenting a claim for wrongful dishonor of checks supported by evidence, but yet unadjudicated. [Had Count III incorporated by reference a § 400.4–402 cause of action for wrongful dishonor, nevertheless, that ground of putative error was never presented on the appeal from the judgment on Count III and simply was not a subject for review.]

The disposition of the dissent, therefore, to reverse the summary judgment on Count III on a theory never pleaded, on a ground never asserted, and on a point never briefed, relied on or presented on appeal, disserves the litigants, sound appellate practice and the unvaried decisions to the contrary.

The concern of the dissent that a theory of recovery for wrongful dishonor of checks latent in the good faith pleading of Count III, but not exploited by Rigby, would go unnoticed by Rigby is not only gratuitous, but unnecessary. Rigby *did* plead the cause of action: Count VI pleads that the premature exercise of setoff by Boatmen's as a *wrongful dishonor of checks under § 400.4–402 of the U.C.C., the very cause of action the dissent says inheres in good faith Count III and remains yet unadjudicated against Rigby by the summary judgment.* Count VI was also adjudicated against Rigby by summary judgment—but Rigby asserts no error as to that adjudication in this court, nor presents it as a point relied on for review in the briefs on appeal, and so any error in the summary judgments on Count IV and Count VI is effectively abandoned. *Pruellage v. De Seaton Corporation,* 380 S.W.2d 403, 405[3, 4] (Mo.1964).

component of the voluminous record of evidence before the court on the motion—to adjudge Count V against Rigby under Rule 74.04. The deposition excerpt acknowledged that no representative, or other person in authority with Boatmen's, ever made any untrue statement or misrepresentation to Ingram as to the Rigby loan "or [as to] any other matters connected with the Rigby loan."

Rigby contends, nevertheless, that the concession that no Boatmen's false utterance induced its reliance does not preclude fraud from a reliance induced by Boatmen's false silence—hence, a material issue of fact yet remained, and summary judgment was not appropriate. The episode of that tacit misrepresentation, as Ingram reports in his deposition interrogation, was the meeting convened at his home on October 17, 1976 among Boatmen's Davis and McCarter, Ingram, and Ingram confidant and advisor Johnson:

Q. [D]id either Mr. McCarter or Mr. Davis state to you at that meeting that the note and loan to the Rigby Corporation which was due October 25, 1976, would be renewed?

A. No, they were silent.

. . . .

Q. In the meeting at your home on October 17, 1976, at which you, Johnson, Davis and McCarter were present, did Davis or McCarter say anything at that meeting that led you to believe that the Boatmen's Bank would renew the note and loan to the Rigby Corporation which was due October 25, 1976?

A. Yes.

Q. What did they say that led you to believe that?

A. They refrained from saying that they would not renew it, and silence in this instance I interpreted as assent.[15]

Actionable fraud requires proof of (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity, or ignorance of its truth, (5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of the falsity of the representation, (7) reliance by the hearer on the truth of the representation, (8) a right to rely thereon, (9) consequent injury proximately caused to the hearer. *Ackmann v. Keeney-Toelle Real Estate Co.*, 401 S.W.2d 483, 488 (Mo. banc 1966).

Rigby interpolates this formula of fraud by utterance into a fraud by silence and conduct:

"The fraud arises from initially demanding additional collateral in response to Rigby's request for additional time and then accepting collateral in silence when they knew that Rigby was acting in reliance upon the belief that additional collateral would forestall collection procedures."

A promise accompanied by a present intent not to perform misrepresents a present state of mind—itself an existent fact—and therefore suffices as a basis for actionable fraud. *Sofka v. Thal*, 662 S.W.2d 502, 507[5, 6] (Mo. banc 1983). We assume for purpose of decision that in the circumstances shown silence means the assent—and hence the promise—to renew the note, so that if accompanied by a present intent not to perform misrepresents an existent fact [a present state of mind], and conclude nevertheless that the unassailable proof demonstrates that, as a matter of law, summary judgment was properly entered against Rigby on Count V.

To prove a submissible case of fraud the pleader bears the burden to establish *every* element by substantial evidence. *Heitman v. Brown Group, Inc.*, 638 S.W.2d 316, 319[3, 4] (Mo.App.1982). The failure of the evidence as to *any* element defeats the

15. There was other evidence by Brennan, McCarter and Regnier that they repeatedly told Ingram that the loan would not be continued after October 25, 1976, unless Ingram pledged the market securities requested as additional security. We discount the effect of that evidence for purpose of this review of summary judgment. *See* Addendum, n. 11, ¶ 6.

cause of action. *Weaver v. Travers,* 631 S.W.2d 81 (Mo.App.1982). The record before the trial court, and to us on appeal, discloses that there was evidence only that—the promise by silence to renew the note at the October 17, 1976 meeting assumed—Boatmen's [through Davis and McCarter] had no knowledge that the promise of assent was false at the time made, Rigby had no right to rely on any such tacit assent, Rigby did not rely on the assent, and Rigby suffered no provable injury proximately caused by any such reliance.

The uncontradicted import of the record is that the bankers, Regnier and others, made the decision not to renew the Rigby note on the due date, October 25, 1976, for effect after the close of the regular bank business day. There is no support for the argument [a silent promise assumed] that on October 17, 1976, Boatmen's, despite assent to extend the due date, already harbored the undisclosed intention not to renew the note. Fraud, although never presumed, may be proven by the circumstances rather than directly. *Powers v. Shore,* 248 S.W.2d 1, 5[2, 4] (Mo. banc 1952). The truth or falsity of the representation, however, is determined as of the time it was made, and as of the time it was intended to be—and was—relied and acted upon. *"If the expression of a state of mind or an existing purpose was true when made, and was made in good faith, then any subsequent change of purpose made in good faith is not material to the transaction."* [emphasis added] *Id.* at 6. Thus, the Boatmen's preparation of the notice of nonrenewal to Rigby on October 21st to prepare for the October 25th contingency, does not bear to prove an intention not to renew on October 17—the date the assent to renew [once again, a fact assumed] was tacitly represented.

Nor does the Boatmen's acceptance on October 20 of the $140,000 in marketable securities bespeak a state of mind on October 17 to deceive and to call the note despite the additional collateral. The performance Boatmen's expected and of which

Ingram acknowledges he was repeatedly advised [from at least as early as the October 12 meeting with Brennan in St. Louis] was marketable securities in the value of *$200,000,* not $140,000. It was a pledge of shares demanded and expected from the more than $6,000,000 in securities the Ingram financial statement furnished Boatmen's as an incident of the line of credit to Rigby, ascribed as personal assets. The acceptance of that partial performance is altogether consistent with a promise to renew [as Rigby asserts and we assume] and altogether consistent with the refusal to renew when the condition for the renewal was not met.

Actionable fraud is a willful and malevolent perpetration of wrong. *Judd v. Walker,* 215 Mo. 312, 114 S.W. 979, 980 (1908). Fraud is never presumed and the law allows an inference of such deception "only if the evidence rises above mere suspicion and points logically and convincingly" to its presence. *Weaver v. Travers,* 631 S.W.2d at 83. Thus, where the transaction comports as well with honesty as with fraudulent purpose, the law refers it to the better motive. *Powers v. Shore,* 248 S.W.2d at 5[2-4]. Boatmen's conduct—the assent to extend the note assumed—to call the note on the due date despite the promise to extend, therefore, under the evidence most favorable to Rigby, amounts at best to breach of contract, but not to actionable fraud.

The right to rely and the actual reliance elements of the fraud cause of action, moreover, were simply not proven or even provable, on the record before the trial court for the reasons already expounded, and hence Count V failed as a matter of law. Rigby posits as a major premise of the fraud syllogism that Ingram delivered the $140,000 in personal securities to Boatmen's in reliance on the tacit representation that "additional collateral would forestall collection procedures." That is to say, that the note would be extended upon the pledge of the collateral. The *additional collateral* Boatmen's required, as Ingram acknowledged repeatedly, however, was

the full $200,000 in market securities, and not the $140,000 portion actually delivered. Thus, Rigby did not rely on a representation that additional collateral in a value less than $200,000 would forestall collection, nor was there any evidence for the inference of a promise to renew the obligation on condition that the pledge of additional security in any such lesser value.

▮ Nor can the conveyance of the real estate mortgage by Rigby to Boatmen's on October 14 and the subsequent recordation of the mortgage by Boatmen's on October 22 bear on the proof of the reliance element of the fraud cause of action—that the loan would be continued upon the pledge by Ingram of additional collateral to secure his personal guaranty of the Rigby loan. The mortgage came unsolicited. Ingram [and Rigby] knew, and was advised repeatedly, as his testimony acknowledges, that the mortgage from *Rigby* was unacceptable as the additional security because the conveyance would be avoidable as a preference in the event of the Rigby bankruptcy. The gratuitous grant of the mortgage, therefore, was a unilateral act by Rigby to bolster its own contractual obligation to give collateral, and not given as security for the Ingram guaranty. It was not in performance of the additional collateral which, according to the Rigby hypothesis of liability, was the precondition for the extension of the loan.

▮ Count V was subject to summary judgment for the additional reason that no genuine issue remained, as a matter of law, as to the cause of the damages the petition pleads and the evidence addresses. The petition alleged, in gist, that as the consequence of each of the several torts the counts plead, Rigby was compelled into bankruptcy with attendant business and money losses. In terms of Count V, the theory of recovery was that the Rigby reliance on the Boatmen's and Bancshares misrepresentation that the note would be renewed on condition that Ingram give additional collateral to secure his personal guaranty of the Rigby debt was the proximate cause of the bankruptcy and the at-

tendant damages. We assume for decision that fraud liability was otherwise proven and determine, nevertheless—as a matter of law—that the tortious conduct of Boatmen's and Bancshares was not the proximate cause of the Rigby bankruptcy and of the damages the petition pleads and the evidence addresses. That is simply because under the unassailable proof Rigby could not have avoided bankruptcy by the mere extension of the note on October 25, 1976.

The misrepresentation Count V pleads, and much of the Ingram personal testimony addresses relates, to the meeting between Ingram and the bankers on October 17, 1976. The meeting was convened, according to his personal account, for two urgent reasons: to seek extension of the Rigby loan due on October 25, and to seek an immediate new loan to pay major suppliers, or risk bankruptcy. Ingram advised the bankers that Rigby needed an immediate infusion of $500,000 for that month, October, and an additional $400,000 to $500,000 for the next month, November. The amount due the Rigby suppliers at the end of October was in excess of $400,000 and, by his account, Rigby faced the prospect of a forced bankruptcy unless they were paid. The Rigby losses, already $1,000,000 through September of that year, accumulated another $200,000 by October 17 and continued at the rate of $8,000 per day. The losses were expected to continue through November. Thus, the added money was needed just to keep Rigby in operation as a business.

The urgent need for another loan, in addition to the loan to become due on October 25 was already made known to Boatmen's Brennan at the St. Louis meeting the week before. It was then Ingram first advised a Boatmen's banker—what Rigby financial officer Menze had advised him—that $500,000 was needed in October to pay the trade debts due at the end of that month, and another like sum for November. It was at that meeting with Brennan on October 12, also, that the sale of Rigby as a going business was first mentioned to

Boatmen's. Ingram commented to Brennan that some sixty days would be needed to find a purchaser at an acceptable price. It was a theme repeated by Ingram to the bankers at the October 17 meeting, a week later. It was the Ingram concern, expressed at that meeting, that bankruptcy would undermine two major assets, which an orderly sale would preserve: a $3,000,000 tax loss carry-forward and the Rigby option under the lease to purchase the acreage on which the factory stood for $1 on January 1, 1984. The sale of Rigby as a going asset was not possible unless the suppliers were paid, and that was one of the reasons Ingram convened the meeting of October 17—to seek new funds, to pay the suppliers, and to prevent bankruptcy.

That the Rigby bankruptcy could be averted only by new money to pay the suppliers is confirmed by Rigby attorney Dibble, whom Ingram called to convene a meeting with the bankers on the afternoon of October 25—immediately upon receipt of the Boatmen's notice that the Rigby loan was called. Dibble and Ingram had come to the meeting with a Rigby bankruptcy petition in hand. Dibble was concerned that the creditors would force bankruptcy, and Rigby preferred, if bankruptcy at all, that the proceeding be by voluntary petition. Dibble gave this testimony:

Q. In the course of the discussion, did you and Mr. Ingram explain the financial condition of Rigby?

A. Well, only in the sense that *it had to have funds if it was going to keep operating.* I think we felt the bank pretty well knew as much about Rigby as we did.

Q. Did you and Mr. Ingram tell the lawyers and Mr. McCarter on October 25th that Rigby needed the note renewed *plus additional money in order to keep operating?*

A. *Yes.* [emphasis added]

The plan with Ingram, Dibble explained, was to "buy 90 days time and the money it took to run the place up to 90 days," in order to find a buyer. The plan was again stated, "to keep it [Rigby] out of bankrupt-cy, to get enough funds just to operate it, just so it could be honest to goodness called a going concern, not in bankruptcy ...." The funds, Dibble suggested, rather than from a new loan, were to come from the receivables already pledged to Boatmen's as collateral and collected into the bank lock-box under the line of credit agreement. The formula for the avoidance of bankruptcy [in the Dibble terminology] was "to keep the creditors at bay, especially some of the big paper companies, for up to 90 days while Bob Ingram and others pursued an effort to find a buyer for the company as a going concern. *The key to that was two things.* [Dibble continued] *One was a renewal, or at least not a declaration of default of the note which came due the 25th, and the other was a continued supply of funds from the receivables to operate the business."* [emphasis added]

The Rigby bankruptcy—and the monetary consequences the petition seeks—therefore, could not have been averted by the nonenforcement of the promissory note obligation alone, but only by the infusion of new funds from Boatmen's—whether as a new loan or as a relinquishment of pledged collateral, neither of which Boatmen's was under obligation to supply.

A plaintiff bears the burden to prove an allegation of tort. It is not enough that damage follow upon misconduct, but the tort must be the legal cause of the damage. *Moore v. St. Louis Southwestern Railway Co.,* 301 S.W.2d 395, 402[5] (Mo.App.1957). Tortious conduct is a legal cause of damage if it is a substantial factor in the production of the harm. *Stumpf v. Panhandle Eastern Pipeline Co.,* 354 Mo. 208, 189 S.W.2d 223, 227[7–9] (1945); Restatement (Second) of Torts § 431 (1965). A plaintiff, to prove the cause of action in tort, therefore, must adduce evidence which allows the reasonable inference that, more likely than not, the misconduct of the tortfeasor was a cause in fact of the result. *Warner v. St. Louis & M.R.R. Co.,* 178 Mo. 125, 77 S.W. 67, 69 (1903). Thus, there can be no recovery where there is uncertainty that the

harm resulted from the conduct alleged to be tortious. *Moore v. St. Louis Southwestern Railway Co.,* 301 S.W.2d at 402[5]; 25 C.J.S. *Damages* § 27 (1966). Within this structure of principle, tortious conduct is not a substantial factor in the production of harm to another if the harm would have eventuated even if the conduct had not been tortious. Restatement (Second) of Torts § 432(1) (1965). That is, *simpliciter:* "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." Prosser and Keeton, The Law of Torts § 41 at 265 (5th ed. 1984).

The record before the trial court shows by unassailable proof—every favor of the evidence accorded Rigby—that the Boatmen's and Bancshares refusal to forgo the call of the promissory note when due on October 25 was not the cause in fact of the Rigby bankruptcy, and the damages in consequence, which followed. The prospect of an imminent and unwanted bankruptcy was a threat Rigby faced, whatever the decision of the bankers to call the note, and was inevitable unless a source of fresh money was found. Rigby owed its suppliers $420,-119.18, and they were restive for immediate payment, so that a forced bankruptcy was foregone unless a fresh and "continued supply of funds" to operate the business was forthcoming—either from a new million-dollar loan from the bankers, or from the relinquishment of the banker collateral. Rigby could be spared from bankruptcy and preserved as a going business only on the concurrence of two contingencies: that the promissory note not be enforced, and a fresh supply of money to pay the suppliers so as to ensure continued operation of the business for an additional two or three months. The theory of Count V is that Boatmen's and Bancshares breached a duty as to the first contingency—that it fraudulently misrepresented a promise not to renew. Boatmen's and Bancshares, however, had no duty to loan new money or to relinquish collateral—nor does Rigby claim any such duty was owed the company. The suppliers posed the threat of bankruptcy unless they were then paid. They were not paid, and the obligation to pay them was that of Rigby, not of the bankers; and the breach of that obligation was that of Rigby, and not of the bankers. Rigby took the initiative into bankruptcy in order—as Rigby attorney Dibble testified—to attempt a reorganization rather than a liquidation forced by the creditors. In either case, a cause which precipitated the demise of Rigby as a going business was the insistence of the suppliers for payment and the lack of Rigby funds to pay. It was a cause which made bankruptcy inevitable whether or not the promissory note was renewed.

Summary judgment was properly entered against Count V.

## PRIMA FACIE TORT

Count VIII of the Rigby petition undertakes to plead a cause of action in prima facie tort. The petition alleges, and evidence was tendered to prove, that the Boatmen's and Bancshares call for more collateral from Ingram when the security given by Rigby was already sufficient to ensure repayment of the debt, the failure of the bankers to renew the note and to notify Rigby of that intention, the resort by the bankers to the set-off of the checking account as a means of satisfaction of the debt, all done with the knowledge that these actions would reduce Rigby to bankruptcy and with the intention to bring about that injury constituted an actionable tort—the prima facie tort.

The prima facie tort principle was recognized in *Porter v. Crawford & Co.,* 611 S.W.2d 265 (Mo.App.1980). The doctrine allows a cause of action to one damaged by an intentional, and otherwise lawful act of another, done without sufficient justification. *State ex inf. Ashcroft v. Kansas City Firefighters Local 42,* 672 S.W.2d 99, 115 (Mo.App.1984). Our decisions that the summary judgment was properly entered against the Rigby petition on the pleading of Count III—the banker want of good faith under § 400.1–203 and § 400.1–208 of the Code—and on the plead-

ing of Count V—the banker misrepresentation to renew the note on condition of additional Ingram collateral by Ingram on the personal guaranty—already determine that the banker conduct Rigby replicates to allege and prove the prima facie tort were lawful exercises of contract right. Our decision on good faith Count III determines that the banker call for collateral as additional security for the loan was an honest in fact exercise of a contract right under the Ingram personal guaranty of the line of credit agreement. Our decision on good faith Count III determines also that there was no agreement between the bankers and Rigby-Ingram to renew or extend the loan when it became due, and that the set-off was enforced after the time for the payment of the note had elapsed, and hence was also an exercise honest in fact of a contract right under the terms of the promissory obligation. Our decision on fraud Count V determines that the banker call for collateral from Ingram was not a tacit promise to renew the note, but—once again—the exercise of that right of contract. These causes of action and the components of fact they encompass, therefore, are already determined against Rigby by the unassailable proof, and no genuine issue remains as to them—whether as a matter of the breach of good faith, fraud, or prima facie tort.

In the terms of the prima facie theory of recovery Count VIII pleads, therefore, our opinion already determines that the banker conduct was lawful—actions taken as rights of contract. Rigby contends, nevertheless, that there remain genuine issues of fact as to whether the banker conduct, even though lawful exercises of right, were done with such malevolence and otherwise without sufficient justification as to render them culpable in prima facie tort.

 Rigby refers to the deposition testimony of banker Johnson—confidant and advisor to Ingram, and the deposition testimony of banker Barry—tendered as an expert by Rigby—that the circumstances of the call for personal collateral from Ingram, the refusal to renew the note, and the offset of the Rigby checking account to exercise collection of the debt—and consequent dishonor of checks presented against the Rigby account for payment bespoke malice and purpose to ruin Rigby. In the precise rendition of that testimony:

Well, in all my banking experience, I've never seen anything like this done. It's unheard of. And the reasons are many, but one of them is just what you alleged—or alluded to, and that is that you know that when you move in on a company and seize your collateral and certainly it's evident to anybody when you offset, you have destroyed the company, because everybody reads it as the end when they get insufficient checks returned and they know the collateral has been seized, paper goods and the ink, and the receivables, you know the jig is up.

The testimony of banker witness Barry concurred, although with less vehemence. Our opinion decides, however, and we repeat, that the banker call for Ingram collateral [even if a mistaken business judgment] and the consequent call of the note when due and resort to the setoff collection remedy after maturity of the obligation were all exercises of contract right, honest in fact. As such, they do not bespeak intent to injure. The intent to injure a prima facie tort suitor must prove is *an actual intent to injure* the suitor, and not merely an intent to act. *Lundberg v. Prudential Insurance Company of America*, 661 S.W.2d 667, 670[3, 4] (Mo.App.1983); *Dowd v. General Motors Acceptance Corp.*, 685 S.W.2d 868, 872[2] (Mo.App.1984).

Rigby cites deposition excerpts from the testimony of banker Johnson, nevertheless, that on the October 17 occasion—when Ingram, Johnson and bankers McCarter and Davis convened to discuss the Rigby financial plight—the manner in which McCarter dismissed the Johnson suggestions that Boatmen's and Bancshares accept the Ingram radio stations, lockers and Rigby mortgage as the Ingram collateral was, "if not antagonistic, certainly ungracious." Rigby cites also the Ingram deposition excerpt that his friendship with Johnson was

known to McCarter, and prompted McCarter to treat Rigby and Ingram with a like hostility—evidenced by the refusal of the radio stations, lockers and mortgage as collateral for the Ingram guaranty.

We assume for purpose of decision that the record tends to prove that Boatmen's and Bancshares intended to injure Rigby, and determine nevertheless that summary judgment was properly entered against Rigby on Count VIII because there was no evidence of an absence of justification for the banker demand for additional collateral from Ingram on his personal guaranty and the consequent call of the note on the day of maturity. That is because Boatmen's and Bancshares, in the call on Ingram for liquid collateral to secure his personal guaranty of the Rigby indebtedness was in the exercise, not only of a contract right, but of a valid business interest—the protection of its depositors. Thus, the acceleration by a bank of the due date on a note upon information that the debtor car dealership had suffered a net operating loss was sufficient—*even if the bank conduct amounted to a breach of contract*—as justification against a claim of prima facie tort liability: "[I]ts actions were unequivocally justified vis-a-vis a prima facie tort, because the bank 'had a valid business interest to protect.'" *Luxonomy Cars, Inc. v. Citibank, N.A.,* 65 A.D.2d 549, 408 N.Y.S.2d 951 at 954[4, 5] (1978). The resort in such a case is to the breach of contract remedy, and not to prima facie tort. *Fifty States, Management Corp. v. Niagara Permanent Savings and Loan Association,* 58 A.D.2d 177, 396 N.Y.S.2d 925, 927 (1977). *Also Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 555[12] (Mo.App.1983).

Our own decisions adopt the rationale of the New York cases. In *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.,* 705 S.W.2d 42 (Mo.App.1985), the bank sued to collect the unpaid balance due on a demand note and the debtor Distributors counterclaimed that the bank knew that the call of the note would put Distributors out of business and sought damages on the theory of prima facie tort. We reversed the judgment for damages:

> Distributors had been losing money for some time, the Bank had information that inventory figures being supplied to it might be suspect and the percentage of receivables overdue by more than 90 days was considered high. The Bank felt the company was really in a negative position by their own financial statement. In these circumstances the Bank clearly had a valid business reason for calling the note due. *This justification alone is sufficient to defeat Distributor's prima facie tort claim.* [emphasis added]

The banker call on Ingram to secure his personal guaranty of the Rigby debt by *liquid* collateral—market shares in the value of $200,000 from among the $6,000,000 in such securities the Ingram statement of personal financial worth listed—and the refusal of the lockers, radio stations and mortgage [in view of the dramatic deterioration of the Rigby business, the concomitant decline in receivables, the continued loss at $8,000 per day, and the threat of bankruptcy] was prompted by the protection of a valid business interest, and hence justification against any injury the prima facie tort remedy protects.

The summary judgment was properly adjudicated against Count VIII because, as a matter of unassailable proof, no genuine issue of fact remained as to the lack of justification element of the prima facie tort cause of action. The summary judgment was properly adjudicated for yet another reason: the injury component of the cause of action was not provable. The damages Rigby pleads and undertakes to prove—the loss of the enterprise and of reputation from bankruptcy—were, as our opinion already determines—consequences foregone from the want of fresh Rigby funds to pay the suppliers, whatever the conduct of the bankers.

### THE MOTION TO AMEND
### THE PETITION

Rigby tendered a second amended petition on February 22, 1984, more than

five years after the commencement of suit. The first amended petition was framed in separate counts, each grounded in tort: conversion, breach of a covenant of good faith, fraud and prima facie tort. The amendment tendered a new cause of action, a breach of contract. The contract the amendment alleges is the Boatmen's letter of agreement dated March 10, 1976 [and executed on behalf of the bank by Vice-President Regnier] to extend to Rigby [through company President Ingram] a line of credit according to the terms of that letter. The amendment alleges also that Rigby substantially performed its obligations under the agreement, but Boatmen's failed to perform its agreement "by terminating the line of credit extended to [Rigby]." The tendered pleading concludes that as a direct result of the Boatmen's failure of performance, Rigby "was damaged as has been set out in the other counts which have been incorporated herein"—actual damages of $5,221,000. The trial court refused the amendment on the ground, among others, that "[t]his case has been pending for over five years and [Rigby] has had plenty of time to come up with this new theory. It does nothing to clarify or cure any defects in the original petition and would probably give rise to a new flood of motions." The trial court determined also that to allow the amendment would be unfair to the defendant banks, and hence denied the motion. We conclude that the court acted within Rule 55.33(a) and that the denial was not an abuse of discretion. *Chapman v. St. Louis County Bank*, 649 S.W.2d 920, 923[6, 7] (Mo.App.1983); *Semo Grain Co. v. Oliver Farms, Inc.*, 530 S.W.2d 256, 259[3, 4] (Mo.App.1975).

The fact of a line of credit agreement tendered by Boatmen's of Kansas City [and correspondent Boatmen's of St. Louis] to Rigby President Ingram, and accepted by Rigby, was a fact which not only suffused the evidence garnered by the parties to prove and defend against the several tort causes of action the Rigby first amended petition pleads, but is the very fundament of the transaction between them. The essential terms of agreement were: the extension of a line of credit to the total of $1,500,000 secured by a blanket assignment of Rigby accounts receivable and inventory, the receivables to be deposited in a lock-box to be collected by the bank and credited to the Rigby account, with Rigby to execute each month a one-month promissory note due on the 25th day of the next month, in a principal amount not greater than that allowed by the formula of 85% of receivables and 75% of inventory based on a monthly position report as to those items of collateral and as to profit and loss, payable at a rate of interest of 2% above prime—with the credit so extended secured by the personal guaranty of Ingram.[16] Thus, the banker tort Count III pleads and undertakes to prove—the breach of good faith in the call for collateral from Ingram under the guaranty, the breach of an agreement to extend the promissory note, and the premature exercise of setoff under the promissory note—were all incidents of the line of credit agreement and presuppose the fact of such a consummated transaction. The banker fraud Count V pleads and undertakes to prove rests on a representation to renew the note upon condition of additional collateral under the Ingram guaranty, and so also presupposes a subsistent line of credit agreement between Rigby and Boatmen's. The banker malevolence prima facie tort Count VIII pleads rests on the intentional banker call for more Ingram security when the collateral already sufficed under the terms of the agreement, failure to renew the promissory

---

**16.** The letter of March 10, 1976 from Boatmen's Vice President Regnier to Rigby President Ingram was, in fact, a formal memorial of an agreement already consummated between those principals and already partially performed. The month before, on February 23, 1976, Ingram as president of Rigby executed a security agreement whereby the company pledged the accounts receivable and inventory for repayment of the line of credit debt. Then, on February 27, 1976, Boatmen's issued to Rigby under the line of credit agreement the first advance: $500,000. That loan was evidenced by a thirty-day promissory note to repay the sum with interest at the rate of 8¾% per annum.

note, and a premature exercise of setoff—all with the intent to injure Rigby—and so presupposed them as incidents of a subsistent line of credit agreement.

In a word, the facts upon which the contract cause of action tendered by the second amended petition on February 22, 1984 [while the motion for summary judgment on the first amended petition pended] were based, were known to Rigby from the very outset of the litigation some five years earlier. The several causes of action Rigby asserted in the first amended petition filed on October 21, 1981 were all framed to recover in tort. There is no reason why a count in contract could not have been included, even if as an alternative to tort. The purpose of the grant of an amendment is to allow a party to assert a matter unknown or neglected from inadvertence at the time of the original pleading. *Smith v. St. Louis County Softball Association*, 623 S.W.2d 38, 40[5–7] (Mo. App.1981). The provision Rule 55.33 makes for a generous allowance of amendment is not a grant of mandatory right. *Boling v. State Farm Mutual Automobile Insurance Co.*, 466 S.W.2d 696, 699[4–6] (Mo.1971). The discretion remains in the trial court to deny such a request. *Willett v. Reorganized School District No. 2*, 602 S.W.2d 44, 48 (Mo.App.1980). The discretion is wide and will not be overturned on appeal unless the exercise is palpably abused. *Baker v. City of Kansas City*, 671 S.W.2d 325, 329[7–10] (Mo.App.1984); *Semo Grain Co. v. Oliver Farms, Inc.*, 530 S.W.2d 256 at 259. That determination "is best measured in terms of whether justice is furthered or subverted by the course taken." *Baker*, 671 S.W.2d at 329[11–12]. The court here, by explicit finding, determined that the new contract theory tendered by the amendment "d[id] nothing to clarify or cure any defects in the original petition ... is a futile attempt to avoid summary judgment late in the game and is unfair to defendant." It is so that the liberal amendment rule may not be employed as a stratagem of litigation. *Brassfield v. Allwood*, 557 S.W.2d 674, 677[2] (Mo.App.1977). The denial of amendment

is presumed correct, and the burden is on the proponent to show an abuse of discretion. That has not been shown. *Vonder Haar Concrete Co. v. Edwards-Parker, Inc.*, 561 S.W.2d 134, 138[4, 5] (Mo.App. 1978).

Rigby was not prejudiced by the denial of the amendment in any case. That cause of action pleads the banker agreement to extend a line of credit on the terms and conditions already delineated, the Rigby performance, and the Boatmen's breach "by terminating the line of credit." The total credit the agreement obligated Boatmen's to extend to Rigby was $1,500,000. It was uncontroverted that on October 25, 1976—when Boatmen's called the note as due and hence "terminated the line of credit"—$1,450,000 plus an additional $20,000 in interest had already been extended. Thus, the verity and proof of the tendered cause of action assumed, there remained only $30,000 of the line of credit yet unextended to Rigby. The Boatmen's nonperformance [even if assumed as a proven breach], therefore, was to terminate the agreement before Rigby received the benefit of the full line of credit—that is, before Rigby was loaned the additional $30,000. The injury the tendered contract cause of action alleges from the breach is as "set out in the other counts" [of the first amended petition]. That is, the bankruptcy and ruination of Rigby as a going business. The full performance by Boatmen's of the line of credit agreement—the loan of the remaining $30,000—however, could have made no difference to the outcome of Rigby. It was the uncontroverted evidence, we need repeat, that at the time the agreement was "terminated," some $420,000 were owed Rigby suppliers, and they threatened bankruptcy unless paid. The strike continued, as did the business loss at $8,000 per day, and unless $500,000 in new funds were infused for that very month, October, and another $400,000 for November, Rigby could not survive. The new money was not in the offing, and bankruptcy was foregone. The breach of the line of credit agreement, therefore, was not the

proximate cause of the injury Rigby contends for recovery. *Hiatt Investment Co. v. Buehler*, 225 Mo.App. 151, 16 S.W.2d 219, 225[7] (1929); *See* 5 Corbin on Contracts § 997 (1964); 25 C.J.S., *Damages* § 18 (1966). Rigby was not prejudiced by the refusal of the trial court to allow the second amended petition.

## MISCELLANEOUS

Rigby asserts as a generic complaint that the summary judgment neglected consideration of certain deposition testimony, exhibits and pleadings. Our review encompasses the *entire* record and our decision to affirm the summary judgment as to each count rests on the unassailable proof—derived from all the paraphernalia of the record taken in the light most favorable to Rigby and the benefit of every reasonable doubt accorded Rigby—that no genuine issue of any material fact exists as to any of the causes of action adjudicated and on review. Rule 74.04(h); *Perkins v. Schicker*, 641 S.W.2d 432 (Mo.App.1982).

Rigby complains separately that the summary judgment "ignored the evidence of the March 10, 1976 Regnier letter to Ingram as president of Rigby [the line of credit tender of agreement] and the October 12, 1976 Ingram meeting with Brennan and then the October 17, 1976 Ingram and Johnson meeting with the Boatmen's bankers as a culminated agreement to renew the note upon the receipt from Ingram of collateral to secure his personal guaranty of the Rigby note." The role of the actors, both Rigby company and bank personnel, and the incidents of the elapsed transaction from inception on February 27, 1976 until October 25, 1976, when the principals convened for the last time to attempt an accommodation, and the Rigby bankruptcy the day after, are all described, treated and considered in the course of our decision on each of the adjudicated counts on review. Whatever the incidents of evidence the trial court memorandum in support of summary judgment may have slighted in mention, our review and decision rests on a record

scoured, sifted and determined under Rule 74.04.

The summary judgment is affirmed as to each count on appeal. Ingram Enterprises, Inc. is dismissed as a party plaintiff to the petition.

PRITCHARD, P.J., concurs in separate opinion filed.

DIXON, J., dissents in separate opinion filed.

PRITCHARD, Presiding Judge, concurring.

Appellants' petition is in eight counts. Count I is a general description of the theories upon which appellants relied, and factual allegations thereon. The petition then undertook to describe and plead seven denominated tort causes of action: Count II, a premature call of appellants' promissory note as a conversion; Count III, for breach of an obligation of good faith under §§ 400.1-203 and 400.1-208, RSMo 1978; Count IV, for wrongful seizure of Rigby's checks in the checking account as a conversion; Count V, fraud; Count VI, for wrongful setoff by premature exercise as to a note not yet in default and hence liability for wrongful dishonor of checks under § 400.4-402, RSMo 1978; Count VII, violation of a lock-box security agreement provision as a conversion of checks due Rigby deposited therein; and Count VIII, sounding in prima facie tort. The trial court rendered summary judgment against appellants on all eight counts of the petition.

Appellants' brief treats only three of the pleaded causes of action: Point I, error in granting summary judgment on Count VIII (prima facie tort); Point II, error in granting summary judgment on Count III (breach of the obligation of good faith); and Point III, error in granting summary judgment on Count V (fraud). Nothing is presented in any point as to the propriety of granting summary judgment on Count VI, wrongful setoff of the checking account for a note claimed not to be in default, and hence wrongful dishonor of

checks under § 400.4–102. More specifically, Count VI pleads; "45. That defendant Boatmen's Bank and Trust Co. of Kansas City seized all the funds and checks of plaintiff Rigby Corporation on October 25, 1976, before said note matured, and before the close of that business day, and before default in the payment of said note. 46. That the aforesaid seizure by defendant Boatmen's Bank and Trust Co. of Kansas City was illegal and unlawful and in violation of law and the statutes, including Sections 400.3–506 and 400.4–402, RSMo 1978."

The dissenting opinion says that allegations of Count I of the petition (that the bank improperly failed to pay checks drawn by Rigby which were received by the bank for payment prior to the maturation of the note; and the bank improperly exercised the right of setoff by refusing payment on the checks) were incorporated by reference into Count III. Count I has no precise allegation of illegality and unlawfulness in the seizure of Rigby's funds and checks so as to be in violation of law and statutes—§§ 400.3–506 and 400.4–402, supra, encompassed in Count VI. Paragraphs 11 and 12 of Count I speak of the seizure of the checks due Rigby as a conversion a theory of Count IV which is not included in appellants' brief as a point.

The allegations of Count III concern only the bank's duty of good faith and honesty, and its tortious breach of that duty on a cause of action. The majority opinion, in response to the briefs, fully treats of the breach of that duty by consideration of the alleged agreement to extend the Rigby note as an acceleration; premature setoff as an acceleration of payment; demands for additional collateral; and breach of §§ 400.1–203 and 400.1–208 duty of good faith as a basis for a cause of action (in themselves). Each of these matters were properly ruled adversely to appellants. There is simply no issue of wrongful setoff or liability for wrongful dishonor of checks contained in Count III. That issue was contained only in Count VI, the ruling upon which is not pursued on this appeal.

Nor is there any issue here of wrongful setoff and dishonor because Rigby's checks had been posted to its account before the setoff was accomplished, even assuming that such was the fact. Appellants do not present any point that (the record) "certainly *does not show* by unassailable proof that the checks *had not been posted* and thus not finally paid" as the dissenting opinion posits.

The dissent proposes an issue which was not briefed to this court, which must confine its review solely to points briefed. *Kurtz v. Fischer*, 600 S.W.2d 642, 645[1] (Mo.App.1980). The matter alleged in Counts IV and VI, must be deemed to have been abandoned on appeal. *Pruellage v. DeSeaton Corporation*, 380 S.W.2d 403, 405[3, 4] (Mo.1964); *School Dist., etc. v. Transamerica Ins. Co.*, 633 S.W.2d 238, 253[20] (Mo.App.1982), and cases cited. It would be a disservice to and unfair to respondent to take up sua sponte, the matters asserted in the dissenting opinion.

The majority opinion covers all of the points presented by appellants exhaustively and correctly. I fully concur therein.

DIXON, Judge, dissenting.

I respectfully dissent. I believe that the trial court erroneously granted summary judgment on Count III of plaintiff Rigby Corporation's petition.

Plaintiff pleaded in Count I a variety of wrongful actions by the defendant Banks. Among those claims was an assertion that the payor Bank improperly failed to pay checks drawn by Rigby which were received by the Bank for payment prior to the maturation of the note. The pleading asserts that the payor Bank improperly exercised the right of setoff by refusing payment upon these checks. These allegations of Count I were incorporated by reference into Count III.[1] Factually, there is no doubt that checks received on Friday,

1. The concurrence questions whether the issue was pleaded. The verbatim portions of the

pleadings asserting this theory are included in the appendix to this dissent.

October 22, and Monday October 25, 1976, were dishonored by the payor Bank. The Banks assert that since the return of these checks was within the time permitted under the clearing house rules and prior to the midnight deadline these checks were not finally paid and were therefore subject to dishonor. That assertion misconstrues § 400.4–213(1), RSMo 1978, which reads as follows:

(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement. Upon a final payment under subparagraph (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

While it is true that § 400.4–213(1)(b) allows the bank any time it has under the settlement rules to determine whether to finally settle for a check, the right to revoke the settlement is dependent upon whether or not final payment has occurred under any of the other provisions of the section set forth above, particularly subsection (c), which refers to the posting of the item. The definition of posting is contained in § 400.4–109, RSMo 1978, and reads as follows:

The **"process of posting"** means the *usual procedure* followed by a payor. bank in determining to pay an item and in recording the payment including *one or more* of the following or other steps as determined by the bank:

(a) verification of any signature;

(b) ascertaining that sufficient funds are available;

(c) affixing a "paid" or other stamp;

(d) entering a charge or entry to a customer's account;

(e) correcting or reversing an entry or erroneous action with respect to the item.

(Emphasis supplied).

Any *one or more* of the steps set forth above may constitute a posting. Posting in the U.C.C. sense is final payment. Once the check is finally paid, no right of setoff against that check can exist. The majority opinion carefully explicates that if there was an acceleration of the note and an early setoff, a cause of action would exist under the good faith provisions of the U.C.C. On the other hand, if the setoff was not made prior to payment of the checks, and the payor Bank dishonored the Rigby Corporation's checks after those checks had been finally paid, then a cause of action for wrongful dishonor arises under § 400.4–402, RSMo 1978.

A case precisely in point on this theory of recovery is *Raymer v. Bay State National Bank*, 384 Mass. 310, 424 N.E.2d 515 (1981). In *Raymer*, the bank set off its depositor's account against a revolving loan and consequently dishonored certain of the depositor's checks after the checks had already been posted. Even though the posting was completed before the midnight deadline for return of the checks, the court held that the dishonor was wrongful because the setoff had come *after* the completion of posting. *Id.* 424 N.E.2d at 519. The theory of wrongful dishonor and the priority of setoff are carefully and fully explained in leading texts concerning the code sections in question. *See* 7 R. Anderson, Uniform Commercial Code § 4–402:8–:13 (3d ed. 1985); 5A Michie on Banks and Banking § 233 (1983).

Adverting now to the factual issue posed by this case as to whether there was a posting of the checks, the principle governing our review must be remembered. The Banks were *defendants* and received summary judgment in their favor. This neces-

sarily means that irrefutable proof must exist that plaintiffs can show no cause of action. The majority opinion recites the same principle of review. The plaintiff need not make out its case by proof. The pleading does that and only when the movant shows irrefutable proof which converses an element of the plaintiff's case or proving an affirmative defense defeating the claim can a defendant prevail on a pleaded cause of action. *E.O. Dorsch Electric Co. v. Knickerbocker Construction Co.*, 417 S.W.2d 936, 938 (Mo.1967); *Miller v. Kruetz*, 643 S.W.2d 310, 312 (Mo.App. 1982).

In the instant case, to show that the Rigby checks had not been posted prior to dishonor, the payor Bank would have had to have shown by unassailable proof that in accordance with its usual and ordinary practices with respect to posting checks, no decision had been made to pay the checks, nor had any record been made of payment. The payor Bank presented no proof regarding its normal and usual practice of posting checks. Mo.Ann.Stat. § 400.4–303 Uniform Commercial Code comment 3 (Vernon 1965) sets forth a variety of factual examples of posting procedures. No proof of the process by which the payor Bank normally and usually reached its decision to pay is presented in this record. In fact, all agree that the processes in this case involved unusual activity including keeping the bookkeeping department open late on Monday, October 25th, to accommodate the payor Bank's exercise of setoff to the amount which had been in the account on Friday morning, the 22nd of October.

The payor Bank dishonored Friday, October 22nd checks in the amount of $51,-364.69 and Monday, October 25th checks in the amount of $35,297.98. The evidence concerning these checks raises a very serious fact question concerning their status as "paid" items. The Bank's witness said the checks were presented, posted and entered. Presentment is normally shown by a date stamp affixed to the check, which often in normal practice is combined with a "paid" stamp. Exhibits filed in the case show that the account of plaintiff was reduced by the amount of the checks presented. The Bank reversed these processes by the issuance of credit memoranda. Significantly, the process of "posting" for the Friday checks appears to have been complete in every respect. The data processing of those checks was completed sometime over the weekend. A "Monday morning balance" was determined and entered in the account. The witness Regnier, the officer of the payor Bank who testified to these matters, constantly referred in his testimony to the "posting" of the checks.

While this record may not prove the affirmative proposition that the payor Bank wrongfully exercised a right of setoff, in violation of § 400.4–303(1)(d), RSMo 1978, it certainly *does not* show by unassailable proof that the checks *had not been posted* and thus not finally paid.[2]

It was the position of the Banks in the brief and oral argument that the right to dishonor checks is governed by the clearing house rules. The Banks cite and rely on *West Side Bank v. Marine National Exchange Bank*, 37 Wis.2d 661, 155 N.W.2d 587 (1968), which interpreted the part of the process of posting which allows "correcting or reversing an entry or erroneous action" to mean that a bank has not completed its process of posting until the clearing house deadline for returning checks has passed. Until that time, says *West Side Bank*, the bank may as part of its posting process determine to reverse an entry whether that entry was erroneously made or not. In *Raymer v. Bay State*

---

2. The position of the dissent is that the so-called matured right of setoff accruing on Monday, October 25th, at the close of business could not be utilized to dishonor checks from Friday, October 22nd, and Monday, October 25th, unless there was unassailable proof that they had not been "posted" or otherwise paid. Setoff was so utilized and thus was an acceleration of the right of setoff and not the exercise of a matured right of setoff. That the Banks did not undertake the mechanics of setoff until after the close of business on Monday, October 25th, does not control. The effect of the setoff was to dishonor checks that may have already been "paid" in the U.C.C. sense and thus wrongfully accelerate the right of setoff.

*National Bank,* the *West Side Bank* case was referred to and was not followed. *Raymer,* 424 N.E.2d at 520. The author of *Raymer* noted the array of commentary which has criticized the *West Side Bank* decision. It was also noted that *West Side Bank* had not considered the setoff provisions of the code. In *Raymer* the trial court found that Bay State's usual procedure was to complete posting by 6 a.m. on the morning following receipt of the item. *Id.* at 519. *Raymer* is sound authority for the proposition that is critical in this case. *Raymer* was authored by Justice Robert Braucher, a principal author, editor, and advisor in the creation of the Uniform Commercial Code.

The brief of the Rigby Corporation does not advance the analysis set forth above with respect to the acceleration and the right of setoff. There cannot be the slightest doubt that Count III was directed to the payor Bank's improper actions in asserting its rights to collect by setoff. The plaintiff Rigby Corporation has properly conceived the underlying theory of improper setoff, but it has failed to recognize the true reason for such impropriety.[3]

This case demonstrates the difficulty encountered in the use of summary judgment procedures in a factually complex setting. When an extensive record such as in the instant case is resolved by summary judgment, it is very difficult to review adequately and tends to absorb extraordinary time and thus contravenes principles of judicial economy. A comparison of the trial court opinion and the majority opinion demonstrates that in order to properly review all of the contentions on appeal the majority was required to go far beyond what the trial court considered. In fact, the trial court opinion does not fully and finally dispose of the issues; it is only because of the catch-all language of the formal order

sustaining the motion for summary judgment on "all grounds" that there is even a semblance of finality.

I would reverse and remand for a trial on the issues presented in Count III.

### APPENDIX

First Amended Petition for Damages
*Count I*

13. On or about January 23, 1976, a promissory note was executed ... in the amount of One Million Four Hundred Fifty Thousand Dollars ($1,450,000.00), .... And the provision and duties of said promissory note and security agreement imposed upon Boatmen's Bank and Trust Co. of Kansas City the duty and obligation of good faith as provided for in Sections 400.-1–208 and 400.1–203, RSMo 1978.

21. [P]rior to October 25, 1976, defendants Boatmen's Bank and Trust Co. of Kansas City and Boatmen's Bancshares, Inc., acting by and through their officers, directors, agents, servants and representatives, ....

....

(D) Secretly planned to and on October 25, 1976, did unlawfully and tortiously offset and convert unto themselves, prior to the maturity of plaintiff Rigby Corporation's note to defendant Boatmen's Bank and Trust Co. of Kansas City, all funds on deposit in plaintiff Rigby Corporation's accounts with defendant Boatmen's Bank and Trust Co. of Kansas City, ....

(F) Planned to and actually seized and applied all funds in plaintiff Rigby Corporation's bank accounts prematurely and prior to the maturity of plaintiff Rigby Corporation's note dated October 25, 1976, at the close of business on October 25, 1976, when said note actually became due and payable.

---

**3.** The concurrence urges that the issue raised in the dissent was not briefed. The dissent concedes its analysis is not contained in the briefs. Rigby did contend that "Boatmen's implemented collection procedures on a note which was neither due nor mature ... the actions on October 25, 1976, must be viewed as an acceler-

ation." The Banks understood "acceleration" was claimed as to the setoff process and argued that there was no "factual predicate" for the claim. The dissent cannot accept the narrow view adopted in the concurrence as to the issues presented.

### Count III

32. Plaintiffs Rigby Corporation and Ingram Enterprises, Inc. incorporate by reference each and every allegation set forth in Counts I and II with the same force and effect as if fully set out herein.

33. That in dealings with plaintiff Rigby Corporation, defendants Boatmen's Bank and Trust Co. of Kansas City and Boatmen's Bancshares, Inc. owed plaintiff Rigby Corporation the duty of good faith and honesty in fact as provided for in Sections 400.1–203 and 400.1–208, RSMo 1978.

34. Defendants Boatmen's Bank and Trust Co. of Kansas City and Boatmen's Bancshares, Inc. willfully, intentionally, knowingly and tortiously breached said duty and obligation of good faith owed to plaintiff Rigby Corporation and acted in bad faith and with malice and by reason of such breach the plaintiff Rigby Corporation sustained damages as heretofore more specifically set forth in paragraph 27 of this petition.